UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
FRANK J. MEROLA, in his official capacity as
Clerk of the County of Rensselaer, New York,

                  Plaintiff,                        No. 19-cv-899 (GLS) (TWD)

     -against-

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York,
LETITIA A. JAMES, in her official capacity as
Attorney General of the State of New York, and
MARK J. F. SCHROEDER, in his official capacity as
Commissioner of the New York State Department of
Motor Vehicles,

                  Defendants.
------------------------------------------------------------------ X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR A JUDGMENT ON THE PLEADINGS AND IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

                                    LETITIA JAMES
                                    *Attorney General*
                                     *State of New York*
JEFFREY W. LANG                           28 Liberty Street
 *Deputy Solicitor General*             New York, New York 10005
VICTOR PALADINO
 *Senior Assistant Solicitor General*
LINDA FANG
 *Assistant Solicitor General*
      *of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF THE CASE ............................................................................................... 1

    A.    Statutory and Regulatory Framework ........................................................ 1

        1.    The issuance of driver's licenses in New York ................................ 1

        2.    The Federal REAL ID Act .......................................................... 3

        3.    Federal and State Voter Registration Laws ...................................... 4

        4.    The Driver's License Access and Privacy Act .................................. 6

    B.    Procedural History ...................................................................... 8

STANDARD OF REVIEW ................................................................................................... 8

ARGUMENT ............................................................................................................................ 9

   I.    THE COMPLAINT SHOULD BE DISMISSED ...................................................... 9

    A.    Merola Lacks Capacity to Bring His Claims. ........................................... 9

    B.    Merola Lacks Standing to Bring His Claims. ......................................... 11

    C.    Merola Does Not Have a Viable Claim Under the Supremacy Clause. .................. 20

    D.    Alternatively, Merola's Preemption Claims Fail on the Merits. ............................ 21

        1.    The Act is presumed valid because it regulates on matters of traditional state interest. ................................................................ 21

        2.    The Act's nondisclosure and notification provisions fall within the State's traditional licensing function. ............................................. 23

        3.    The Act is not subject to field preemption .................................... 26

        4.    The Act does not conflict with any federal statutes cited by Merola. ............ 28

**Page**

II.        Plaintiff Is Not Entitled To a Preliminary Injunction in Any Event..........34

CONCLUSION........................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Anderson v. La Junta State Bank,*
   115 F.3d 756 (10th Cir. 1997) .......................................................................26

*Arizona Dream Act Coal. v. Brewer,*
   855 F.3d 957 (9th Cir. 2017) .........................................................................22

*Arizona v. United States,*
   567 U.S. 387 (2012)..........................................................................27, 28, 29

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015)...................................................................................21

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).........................................................................................9

*Austin v. United States,*
   280 F. Supp. 3d 567 (S.D.N.Y. 2017)..........................................................33

*Babbitt* v. *United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979).......................................................................................12

*Balbuena v. IDR Realty LLC,*
   6 N.Y.3d 338 (2006) ................................................................................22, 28

*Board of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State*
   *Teachers Ret. Sys.,*
   60 F.3d 106 (2d Cir. 1995)......................................................................19, 20

*Bordell v. General Elec. Co.,*
   922 F.2d 1057 (2d Cir. 1991)........................................................................14

*Cayuga Nation v. Tanner,*
   824 F.3d 321 (2d Cir. 2016)..........................................................................12

*Chavez v. Freshpict Foods, Inc.,*
   456 F.2d 890 (10th Cir. 1972) ......................................................................21

*City and County of San Francisco v. Sessions,*
   349 F. Supp. 3d 924 (N.D. Cal. 2018) ..........................................................33

*City of Chicago v. Sessions,*
   888 F.3d 272 (7th Cir. 2018) ........................................................................24

**Cases**  **Page(s)**

*City of New York v. State of New York*,
  86 N.Y.2d 286 (1995) ................................................................................................10, 11

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999)...........................................................................................25, 31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................................................................12

*Cleveland v. Caplaw Enters.*,
  448 F.3d 518 (2d Cir. 2006)................................................................................................8

*Community Bd. 7 of Borough of Manhattan v. Schaffer*,
  84 N.Y.2d 148 (1994) .....................................................................................................9, 10

*Cubas v. Martinez*,
  8 N.Y.3d 611 (2007) ......................................................................................................2, 30

*DeCanas v. Bica*,
  424 U.S. 351 (1976)...............................................................................................22, 27, 28

*DelRio-Mocci v. Connolly Props. Inc.*,
  672 F.3d 241 (3d Cir. 2012)..........................................................................................16, 30

*English v. General Elec. Co.*,
  496 U.S. 72 (1990).............................................................................................................27

*Finch v. Mississippi State Med. Ass'n, Inc.*,
  585 F.2d 765 (5th Cir. 1978) .............................................................................................20

*Flores v. George Braun Packing Co.*,
  482 F.2d 279 (5th Cir. 1973) .............................................................................................21

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)..............................................................................................................28

*Hohman v. Eadie*,
  894 F.3d 776 (6th Cir. 2018) .............................................................................................26

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013)......................................................................................................11, 16

*In re Grand Jury Subpoena to Facebook*,
  Nos. 16-mc-1300 to 1314, 2016 WL 9274455 (E.D.N.Y. May 12, 2016) .............................26

**Cases**                                                                      **Page(s)**

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
    386 F.3d 107 (2d Cir. 2004)................................................................................9

*Johnson v. Hurtt*,
    893 F. Supp. 2d 817 (S.D. Tex. 2012) ...............................................................21

*Kearns v. Cuomo*,
    No. 19-cv-902, 2019 WL 5849513 (W.D.N.Y. Nov. 8, 2019) ...................... passim

*Klebanow v. New York Produce Exch.*,
    344 F.2d 294 (2d Cir. 1965)..............................................................................10

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)................................................................................9

*Mackey v. Montrym*,
    443 U.S. 1 (1979)..............................................................................................23

*Madeira v. Affordable Hous. Found., Inc.*,
    469 F.3d 219 (2d Cir. 2006).........................................................................27, 30

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)................................................................................9

*Marsh v. Rosenbloom*,
    499 F.3d 165 (2d Cir. 2007)..............................................................................28

*Maryland v. King*,
    133 S. Ct. 1 (2012)............................................................................................35

*Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
    30 N.Y.3d 377 (2017) ..................................................................................10, 11

*Metropolitan Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985)..........................................................................................23

*Murphy v. National Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018)......................................................................................33

*Mutual Pharms. Co. v. Bartlett*,
    570 U.S. 472 (2013)..........................................................................................28

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)..........................................................................................22

**Cases**                                                                  **Page(s)**

*New York State Rest. Ass'n v. New York City Bd. of Health*,
    545 F. Supp. 2d 363 (S.D.N.Y. 2008)............................................................34

*New York v. Department of Justice*,
    343 F. Supp. 3d 213 (S.D.N.Y. 2018)...........................................................33

*Piscitelli v. Classic Residence by Hyatt*,
    408 N.J. Super. 83 (App. Div. 2009) ............................................................21

*Plyler v. Doe*,
    457 U.S. 202 (1982).......................................................................................22

*Poe v. Ullman*,
    367 U.S. 497 (1961).......................................................................................20

*Pope v. County of Albany*,
    687 F.3d 565 (2d Cir. 2012)..........................................................................34

*Return Mail, Inc. v. United States Postal Serv.*,
    139 S. Ct. 1853 (2019)..................................................................................12

*Shipping Fin. Servs. Corp. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998)............................................................................9

*Silver v. Pataki*,
    96 N.Y.2d 532 (2001) .....................................................................................9

*Spokeo, Inc. v Robins*,
    136 S. Ct. 1540 (2016)..................................................................................17

*Stoianoff v. Comm'r of Motor Vehicles*,
    107 F. Supp. 2d 439 (S.D.N.Y. 2000)............................................................2

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000).............................................................................9

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) .......................................................29, 31, 32, 33

*United States v. Costello*,
    666 F.3d 1040 (7th Cir. 2012) ......................................................................16

*United States v. Herrera*,
    584 F.2d 1137 (2d Cir. 1978)........................................................................31

**Cases**                                                                        **Page(s)**

*United States v. Vargas-Cordon*,
   733 F.3d 366 (2d Cir. 2013)..................................................................16

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................34

*Wyeth v. Levine*,
   555 U.S. 555 (2009)............................................................................29

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2.........................................................................21

**Federal Laws**

Pub. L. No. 103-322, 108 Stat. 2099 (1994)..........................................32

Pub. L. No. 104-208, 110 Stat. 3009-671 (1996) ..................................22

REAL ID Act, Pub. L. 109-13, 119 Stat. 311-16 (2005)..........................3
   § 201...................................................................................................3
   § 202.........................................................................................3, 4, 18

8 U.S.C.
   § 1227..................................................................................................4
   § 1255................................................................................................15
   § 1324................................................................................................13
   § 1324a..................................................................................13, 28, 29
   § 1324c..............................................................................................29
   § 1373........................................................................................13, 31
   § 1644........................................................................................13, 31

12 U.S.C. § 3405...................................................................................26

18 U.S.C.
   § 1015..................................................................................................4
   § 2703................................................................................................26

Drivers Privacy Protection Act, 18 U.S.C. § 2721 et seq. ....................32

52 U.S.C.
   § 20504........................................................................................4, 5, 18
   § 20506............................................................................................5, 18
   § 20511................................................................................................4
   § 21083................................................................................................5

**Federal Laws**                                                                 **Page(s)**

6 C.F.R.
   § 37.3 ..................................................................................................3, 15
   § 37.71 .........................................................................................................4

Fed. R. Civ. P. 17 ................................................................................................9

**State Laws**

*New York*

Ch. 37, 2019 N.Y. Laws ......................................................................................6

Ch. 81, 1995 N.Y. Laws 2282 ............................................................................2

N.Y. County Law § 525 .....................................................................................10

N.Y. Elec. Law
   § 3-103 .........................................................................................................5
   § 5-210 ......................................................................................................4, 5
   § 5-212 .................................................................................................4, 5, 18

N.Y. Veh. & Traf. Law
   § 201 .................................................................................................... passim
   § 205 .....................................................................................................2, 10
   § 502 .................................................................................................... passim
   § 508 .............................................................................................................7

9 N.Y.C.R.R.
   § 8.170 .......................................................................................................25
   § 6217.5 .......................................................................................................5

15 N.Y.C.R.R. § 3.9 ............................................................................................6

*Other States*

Cal. Veh. Code § 12800.7 ............................................................................13, 25

Nev. Rev. Stat. Ann. § 481.063 ...................................................................13, 24

Wash. Rev. Code Ann. § 10.93.160...................................................................24

**Administrative Authorities**

77 Fed. Reg. 17144 (Mar. 23, 2012)..................................................................24

24 N.Y. Reg. 17 (Sept. 25, 2002).........................................................................2

**Administrative Authorities**                                                                 **Page(s)**

35 N.Y. Reg. 106 (Feb. 13, 2013)..................................................................................3

**Miscellaneous Authorities**

H.R. Rep. No. 104-725 (1995-1996) (Conf. Rep.) ....................................................13, 31

Cal. Senate Rules Comm., Senate Floor Analyses for SB 244 (Aug. 31, 2018),
    https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=2017
    20180SB244#..........................................................................................................25

N.Y. Dep't of Motor Vehicles, *Temporary Visitor with an Expiring Driver*
    *License, Permit, or ID Card,*
    http://nysdmv.custhelp.com/app/answers/detail/a_id/924 ......................................15

Letter from U.S. Dep't of Health & Human Servs. and U.S. Dep't of Agric. to
    State Health & Welfare Officials (Sept. 21, 2000), https://www.hhs.gov/civil-
    rights/for-individuals/special-topics/needy-families/triagency-letter/index.html..................24

N.Y. Assembly Debates on Bill A3675B (June 12, 2019) ............................................23

N.Y. Assembly, Sponsor's Mem. in Support of Legislation for Ch. 37 (2019), at
    https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=3675&term=2019
    &Summary=Y&Memo=Y ........................................................................................22

N.Y. Dep't of Motor Vehicles, *Federal REAL ID*, https://dmv.ny.gov/driver-
    license/federal-real-id .............................................................................................18

U.S. Dep't of Homeland Sec., *REAL ID Enforcement: New York*
    (last updated Sept. 5, 2019), https://www.dhs.gov/real-id/new-york ....................18

## PRELIMINARY STATEMENT

In June 2019, the New York State Legislature enacted the Driver's License Access and Privacy Act (the Act). The Act directs the Department of Motor Vehicles (DMV) to issue driver's licenses to persons without regard to their immigration status, which it accomplishes by expanding the types of proofs of identity and age that DMV must accept. This policy promotes the State's interests in public safety and economic growth by seeking to increase the number of licensed and insured drivers on the State's roads. To ensure these goals will not be undermined by applicants' concerns about confidentiality, the Act also mandates that driver information will not be shared for purposes unrelated to licensing except as required by law, and requires DMV to notify individuals upon receipt of a request from immigration authorities for their personal information.

Rensselaer County Clerk, plaintiff Frank Merola brought this action, purportedly in his official capacity, against the Governor, the Attorney General, and the DMV Commissioner to enjoin them from implementing the Act, and to restrain the Governor and the Attorney General from removing him and other county clerks from office for refusing to comply with the Act. As explained below, this Court should dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim, or alternatively, deny Merola's request for a preliminary injunction.

## STATEMENT OF THE CASE

### A.  Statutory and Regulatory Framework

#### 1.  The issuance of driver's licenses in New York

New York Vehicle and Traffic Law (VTL) mandates that DMV issue driver's licenses to all persons who meet the statutory eligibility criteria—that is, all persons who are able to "furnish such proof of identity, age, and fitness," VTL § 502(1). No provision of New York law has ever expressly conditioned the issuance of a license on an applicant's citizenship or immigration status,

though the types of proof of identity adopted over time by the DMV Commissioner have had the practical effect of precluding undocumented immigrants from obtaining licenses. *See Cubas v. Martinez*, 8 N.Y.3d 611, 617-20 (2007); *see also* Aff. of Mary MacDonald (MacDonald Aff.) ¶ 17.

Specifically, in 1995, the Legislature amended the VTL to require that individuals provide a social security number when applying for or renewing a driver's license. *See* Ch. 81, §§ 209-210, 1995 N.Y. Laws 2282, 2368. The social security number requirement was added to allow the State to "identify individuals who have failed to make child or spousal support payments and, where necessary, to suspend that person's driver's license." *See Stoianoff v. Comm'r of Motor Vehicles*, 107 F. Supp. 2d 439, 443 (S.D.N.Y. 2000), *aff'd,* 12 F. App'x 33 (2d Cir. 2001); Ch. 81, 1995 N.Y. Laws §§ 209-210. In 2002, to harmonize its regulations with statute, DMV amended 15 N.Y.C.R.R. § 3.9(a) to require individuals applying for a license or renewal to provide either a social security number or "proof that [the applicant] is not eligible for a social security number." *See* 24 N.Y. Reg. 17 (Sept. 25, 2002). In practice, such proof typically consists of letters of ineligibility from the U.S. Social Security Administration, which are issued to certain noncitizens who are legally present in the U.S. but not authorized to work. *See Cubas*, 8 N.Y.3d at 617-18.

In many upstate counties, including Rensselaer County, certain DMV functions are performed by county clerks acting as the agents of the DMV Commissioner. VTL § 205(1). Such county clerks and their staff are responsible for accepting and processing applications for driver's licenses to residents in these counties, and are provided access to DMV systems for these purposes. *See* Aff. of Ann Scott (Scott Aff.) ¶¶ 4-5. These county officials may enter and retrieve information from DMV's records on a transaction-by-transaction basis as required to conduct DMV business. *Id.* ¶ 6. All data entered on DMV terminals by county clerk employees and the records scanned by county clerk offices are maintained by DMV on its central systems—not at county clerk offices.

2

As agents of DMV, county clerks and their staff are bound by applicable DMV policies and rules in performing DMV functions. *Id.* ¶ 7. DMV employees and agents are not permitted to access or use DMV records or information except when necessary for official DMV business. *See* DMV, *Protection of Department Records* 1, 3 (rev. Jan. 2019) (annexed as Ex. A to Scott Aff.). And county clerks are not authorized to accept subpoenas, court orders, and other legal documents requesting DMV information and records; those requests may only be accepted at DMV's headquarters in Albany. *See* DMV, *Requests for Information From External Entities* 4 (rev. July 2016) (annexed as Ex. B to Scott Aff.); *see also* 35 N.Y. Reg. 106 (Feb. 13, 2013).

### 2.    The Federal REAL ID Act

In 2005, Congress enacted the REAL ID Act, Pub. L. 109-13, 119 Stat. 311-16 (2005), codified at 49 U.S.C. § 30301 note. Among other things, the REAL ID Act sets forth minimum federal requirements for state-issued driver's licenses and identification cards needed to enter federal facilities and board federally-regulated commercial aircrafts. *See* REAL ID Act, § 201(3). To issue a REAL ID-compliant license or identification, a State must verify an applicant's "lawful status"[1] with federal databases, and maintain copies of the proofs of eligibility submitted by the REAL ID applicant. *Id.* § 202(b)-(d). The REAL ID Act also permits States to issue licenses that are exempt from federal REAL ID requirements, which in New York are referred to as standard licenses. *Id.* § 202(d)(11). Anyone can opt for a standard license, although beginning in October 2020, non-REAL ID-compliant licenses will not be accepted as valid identification at airports.

---

[1] Under federal regulations, "lawful status" is not limited to U.S. citizens and permanent residents, but includes several categories of noncitizens who may *not* have valid visas or who may have entered the country illegally—such as those with pending or approved asylum applications, or those in deferred action status. *See* 6 C.F.R. § 37.3.

Federal law governs the design and appearance of non-REAL ID-compliant licenses, and requires that such licenses prominently "state on their face" that they are "not acceptable for official purposes" and that they be visually distinguishable either in color or design from REAL ID licenses. *See* 6 C.F.R. § 37.71(a)(1)-(2); REAL ID Act § 202(d)(11)(A)-(B). The design and appearance of non-REAL ID licenses issued by States are subject to review and approval by the U.S. Department of Homeland Security (DHS). *See* 6 C.F.R. § 37.71(b).

### 3.    Federal and State Voter Registration Laws

In 1993, Congress enacted the National Voter Registration Act, which mandates that every State's DMV application for a driver's license include a voter registration application so as to permit all persons to register to vote at the same time they apply for a license. *See* 52 U.S.C. § 20504(a)(1), (c)(1). Under federal and state law, such registration applications must set forth the eligibility criteria for registering to vote, advise applicants of the penalties for making false statements, and require an applicant who elects to register to vote attest, under penalty of perjury, as to eligibility. *See id.* § 20504(c)(2)(C)(i)-(iii); N.Y. Elec. Law § 5-212(3)(b)-(c). Individuals who knowingly make false statements concerning their eligibility to vote or provide false information in connection with registering to vote are subject to substantial criminal penalties under both state and federal law. *See, e.g.*, N.Y. Elec. Law § 5-210(5)(k)(xi), (6) (false statements in registering to vote; up to four years in jail and $5,000 in fines); 18 U.S.C. § 1015(f) (false claim of citizenship in registering to vote; up to five years in jail and fines); 52 U.S.C. § 20511(2)(A) (submission of false voter registration applications; five years in jail and fines). Noncitizens who misrepresent their citizenship are also subject to removal and may be barred from becoming lawful permanent residents, among other things. *See* 8 U.S.C. § 1227(a)(3)(D)(i), (6)(A).

When a license applicant registers to vote through DMV, DMV must transmit the

4

"completed voter registration portion of an application for a State motor vehicle driver's license" to local election officials promptly after receipt. 52 U.S.C. § 20504(e)(1); N.Y. Elec. Law § 5-212(6). Since 2012, persons applying to register to vote while performing a license transaction at DMV must do so through an electronic interface, and their voter registration application is then electronically transmitted to the relevant local board of elections by DMV. *See* MacDonald Aff. ¶¶ 8-16. DMV employees and agents are not permitted to interfere with the applicant's response to voter registration questions because both federal and state law prohibits officials from making "any statement to an applicant or tak[ing] any action the purpose or effect of which is to discourage the applicant from registering to vote." *See* 52 U.S.C. § 20506(a)(5)(C); N.Y. Elec. Law § 5-212(11); MacDonald Aff. ¶¶ 19-20 & Ex. A at 1 (DMV Policy Directive MB2217).

Local boards of elections are responsible for reviewing and processing voter registration applications, including those received from DMV, to determine the applicant's identity and eligibility. *See* N.Y. Elec. Law §§ 5-210(8)-(9), 5-212(9); 9 N.Y.C.R.R. § 6217.5(b). Under federal and state law, DMV must share with local boards of election the information reported by license applicants in order to assist these boards in verifying the "accuracy of the information provided on applications for voter registration." *See* 52 U.S.C. § 21083(a)(5)(B)(i); N.Y. Elec. Law § 3-103(2); MacDonald Aff. ¶¶ 13-15. An applicant may establish his or her identity by social security number or driver's license number, but neither is required to register to vote. *See* 52 U.S.C. § 21083(a)(5)(A)(ii); N.Y. Elec. Law § 5-210(8). Other permissible proofs of identity include photo identification, a utility bill, or a bank statement. *See* N.Y. Elec. Law § 5-210(5)(k)(vii)(A)-(D). Apart from the applicant's sworn attestation, no further proof of citizenship is required to register to vote in New York. Once the local board of elections is satisfied as to an applicant's identity and eligibility, the applicant will be enrolled to vote. *See id.* § 5-210(9).

### 4.     The Driver's License Access and Privacy Act

On June 17, 2019, the Legislature enacted the Act to amend the VTL's provisions pertaining to the issuance of standard driver's licenses. *See* Ch. 37, 2019 N.Y. Laws. The Act is scheduled to take effect on December 14, 2019. *See id*. § 8, p.6. Based on the Legislature's view that an individual's citizenship or immigration status is irrelevant to the decision of whether to license him or her, the Act instructs DMV to issue standard driver's licenses to all eligible state residents without regard to citizenship or immigration status. The Act also strengthens the confidentiality protections for the personal information maintained by DMV for all license applicants.[2]

In particular, the Act expands the types of acceptable primary proofs of identity and age for standard licenses by directing DMV to accept various foreign documents, including unexpired foreign passports and consular documents, and foreign driver's licenses. *See* VTL § 502(1) (as amended). The Act also provides that in lieu of a social security number or proof of ineligibility for a social security number, *see* 15 N.Y.C.R.R. § 3.9(a), standard license applicants may submit an affidavit attesting that they have "not been issued a social security number." *See* VTL § 502(1).

The Act expressly states that proof of lawful presence in the U.S. is not required in order to obtain a standard license, *see id.* § 502(8)(b), and prohibits DMV from inquiring about an applicant's citizenship or immigration status for such licenses, *see id.* § 502(8)(e)(ii). The Act restricts the collection and retention of information pertaining to "citizenship or immigration status," social security number eligibility, and the type of documents used by applicants to prove age or identity in connection with applications for standard licenses. *Id.* § 502(8)(c)(i)-(iii). The

---

[2] The provisions of the Act challenged in this action do not implicate REAL ID licenses or standards: every provision of the Act relevant here expressly applies only to standard licenses, or contains an express exception to accord with REAL ID Act requirements. *See, e.g.*, VTL §§ 201(9)(b), 201(10)(b), 201(12)(a), 502(1), 502(8)(a)-(e) (as amended).

Act further prohibits DMV from retaining the originals or copies of the documents used by a standard license applicant to prove age or identity, "except for a limited period necessary to ensure the validity and authenticity of such documents." *Id.* § 502(8)(d).

Additionally, the Act prohibits DMV from disclosing the "original documents and copies of documents" collected from all noncommercial license applicants to prove "identity, age, or fitness" except (a) to the subject of the information, (b) where disclosure is "expressly required" by the REAL ID Act, or (c) as mandated by a court order, a judicial warrant, or a state criminal or civil subpoena. *See id.* § 201(9). The Act also protects from disclosure DMV records that would reveal whether a particular license is a standard license or one that meets federal standards. *Id.* § 201(10); *see id.* § 508(3). The Act further provides that certain personal information and records maintained by DMV about all noncommercial license applicants—namely an applicant's "social security number, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, medical information or disability information"—are "not [] public record[s.]" *Id.* § 201(8).

The Act further prohibits DMV or its agents from disclosing or making accessible "in any manner records or information" it "maintains" for standard license applicants and holders to federal immigration authorities (including the U.S. Immigration and Customs Enforcement and the U.S. Customs and Border Protection), absent a court order, judicial warrant, or criminal or civil subpoena, except where the information sharing is "pursuant to a cooperative arrangement between city, state and federal agencies" unrelated to immigration enforcement (the "nondisclosure provisions"). *Id.* § 201(12)(a)-(c). Although the Act directs DMV to "require any person or entity that receives or has access to records or information from [DMV]" to certify that the recipient of

7

the information will not use the information for civil immigration purposes, *see id.* § 201(12)(b), this requirement does not apply to DMV agents or employees (such as Merola) who do not receive records "from" DMV. *Cf.* Compl. ¶ 28 (Merola's contrary assertion). Finally, within three days of receiving a request for records and information from federal immigration authorities, the Act requires DMV to provide written notification to the subject of the records request about the request, and identifying the requesting agency (the "notification provision"). *See* VTL § 201(12)(a).

## B.   Procedural History

On July 24, 2019, Merola commenced this action in his official capacity as Rensselaer County Clerk against Governor Cuomo, Attorney General James, and DMV Commissioner Schroeder to enjoin implementation of the Act. Merola's complaint alleges that the Act is preempted in toto because it regulates in areas of Congress's exclusive domain. He also contends that the Act is "bad policy" (Compl. ¶ 6), and that complying with the Act's provisions will expose him to criminal prosecutions (*id.* ¶¶ 37, 86). Merola seeks a declaration that the Act is "preempted in its entirety" and an order (a) permanently enjoining defendants from implementing the Act and (b) prohibiting the Governor and the Attorney General from removing him, and other similarly situated county clerks, from office for refusing to comply with the Act. *Id.* ¶¶ 78(a), 80. Defendants answered the complaint on August 29, 2019. On November 11, 2019, as directed by the Court, Merola moved for a preliminary injunction seeking the same relief as in his complaint.

## STANDARD OF REVIEW

A motion for a judgment on the pleadings brought under Rule 12(c) is governed by the same standards as those applicable to a Rule 12(b) motion. *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). A complaint must be dismissed for lack of subject matter jurisdiction

under Rule 12(b)(1) when the "court lacks the . . . constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). The party seeking to invoke jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Id.* While "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000), "jurisdiction must be shown affirmatively," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998), and may not be predicated solely on "conclusory or hearsay statements," *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004). Courts may consider evidence outside the pleadings when deciding a Rule 12(b)(1) motion. *See Makarova*, 201 F.3d at 113.

To survive dismissal under Rule 12(c), the pleading must contain sufficient factual allegations which state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In resolving a Rule 12(c) motion, courts may consider the pleadings and their attachments, "and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

## ARGUMENT

### I.   THE COMPLAINT SHOULD BE DISMISSED

#### A.   Merola Lacks Capacity to Bring His Claims.

This Court should dismiss the complaint at the outset because Merola, as a local official, lacks capacity to bring this action. Capacity "concerns a litigant's power to appear and bring its grievance before the court." *Community Bd. 7 of Borough of Manhattan v. Schaffer*, 84 N.Y.2d 148, 155 (1994). The "threshold matter" of whether a party has capacity to maintain a federal action, *see Silver v. Pataki*, 96 N.Y.2d 532, 537 (2001), is determined by state law, *see* Fed. R. Civ. P. 17(b)(3). Lack of capacity is an issue properly considered in a Rule 12(b)(6) dismissal motion. *See*

*Klebanow v. New York Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965).

Under New York's law of capacity, "municipal corporate bodies—counties, towns and school districts—are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents," and do not have capacity to challenge the actions of "their principal or creator." *City of New York v. State of New York*, 86 N.Y.2d 286, 289-90 (1995). This rule "reflects a self-evident proposition about legislative intent: the 'manifest improbability' that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police state legislation on the basis of those rights." *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 385 (2017) (citation omitted). Absent a specific power "derived from the relevant enabling legislation or some other concrete statutory predicate," counties and their officials simply have no right to sue. *See Community Bd. 7*, 84 N.Y.2d at 156.

Here, Merola's purported official capacity suit is barred by the longstanding rule that local officials and entities "lack the capacity to bring suit to invalidate State legislation." *City of New York*, 86 N.Y.2d at 290. As Merola acknowledges (Compl. ¶¶ 31-32), the duties of the Clerk's Office are to register and file documents, deeds, and judgments, and to issue driver's licenses as the DMV Commissioner's agent. *See* N.Y. County Law § 525; VTL § 205(1). They do not include the power to sue to challenge the validity of a state law.

None of the four limited exceptions to the general capacity bar applies here. In order "to ensure that state-created entities are not thwarted in achieving their constitutionally- and statutorily-mandated purposes," *see Matter of World Trade Ctr.*, 30 N.Y.3d at 402 (Rivera, J., concurring), the Court of Appeals has recognized four exceptions to the general rule precluding suits by local government entities, *see id.* at 386. The only exception that Merola purports to invoke

(Pl.'s Mem. of Law (Mem.) at 21-22) is where the local officials "assert that if they are obliged to comply with the State statute they will by that very compliance be forced to violate a constitutional proscription." *See City of New York*, 86 N.Y.2d at 292.

But Merola has failed to identify any specific constitutional prohibition imposing an obligation on the Clerk's Office in conflict with those imposed by the Act. *See id.* at 295. He thus cannot invoke this "narrow" exception here. *See Matter of World Trade Ctr.*, 30 N.Y.3d at 387. The Supremacy Clause is not itself the source of any freestanding obligations. And as discussed below, the statutes that Merola argues displace the Act are federal immigration statutes that do not impose any obligations on the Clerk's Office that conflict with the Act. Nor has Merola plausibly alleged that the Act requires him to facilitate voter registration (Mem. at 19) any differently from what his office has been required to do under longstanding federal and state laws.

### B.      Merola Lacks Standing to Bring His Claims.

In addition to his lack of capacity to bring his claims, Merola lacks standing to do so. To demonstrate standing, a plaintiff must show: (1) a "concrete and particularized injury;" (2) "that is fairly traceable to the challenged conduct;" and (3) "is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). None of Merola's claims of standing has merit. Many of Merola's arguments for standing have been squarely rejected in *Kearns v. Cuomo*, No. 19-cv-902, 2019 WL 5849513, at *12 (W.D.N.Y. Nov. 8, 2019). The district court's well-reasoned decision in *Kearns*, though not binding, is persuasive and should be followed by this Court.

***First***, Merola does not allege cognizable injury to his office. The injuries that Merola has alleged—criminal prosecution and removal from office (Compl. ¶ 77; Mem. at 20 n.10)—pertain to him as an individual. The County Clerk's Office does not face any threat of prosecution because

11

*the office* cannot be criminally prosecuted under 8 U.S.C. § 1324(a) for harboring or inducing undocumented persons to remain: the statute's prohibitions cover only "person[s]"—not government entities. *See Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1861-62 (2019). Nor has Merola demonstrated any injury to the Clerk's Office "merely from having the county clerk replaced, as happens on a regular basis due to elections, resignations." *See Kearns*, 2019 WL 5849413 at *12. And his claims of self-inflicted harm based on the hypothetical loss of revenues to the county (Merola Decl. ¶ 44) would only occur only if Merola refuses to comply with the Act based on his personal disagreement with the law, *and* if DMV responds by removing DMV licensing functions from the Rensselaer County Clerk. That scenario is too speculative to support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

*Second*, Merola lacks standing based on a threat of prosecution against him personally. When claimed injury is based on a threatened prosecution, a plaintiff must demonstrate that the threat is "credible." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331-32 (2d Cir. 2016). Although a plaintiff need not wait for a criminal prosecution to commence before bringing suit, *see Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), "'a credible threat sufficient to satisfy the imminence requirement of injury' . . . will not be found where 'plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,'" *Cayuga Nation*, 824 F.3d at 331.

Like the plaintiff in *Kearns*, Merola has not plausibly alleged a credible threat of prosecution based on the "violation of federal immigration laws" (Compl. ¶ 77). *See Kearns*, 2019 WL 5849513, at *8-9 (rejecting identical claims of injury). The only federal immigration statute

relied on Merola for his threat of prosecution claim is 8 U.S.C. § 1324(a)(1)(A).[3] Entitled "Bringing in and harboring certain aliens," that statute imposes criminal penalties on "[a]ny person who" "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place," 8 U.S.C. § 1324(a)(1)(A)(iii), or "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law," *id.* § 1324(a)(1)(A)(iv).

Merola has not shown that he faces a credible threat of prosecution for harboring or inducing because he has not alleged any history of criminal prosecutions for conduct that is remotely analogous to the issuance of driver's licenses. Nor could he: thirteen other States, and the District of Columbia and Puerto Rico, have been issuing driver's licenses to their residents without regard to immigration status for years,[4] and no official in any of these jurisdictions has been prosecuted under federal law for issuing driver's licenses or maintaining the confidentiality of driver information. Nor does Merola allege that there have been any threats of prosecution made against him or any officials in these other jurisdictions. *See Kearns*, 2019 WL 5849513, at *9.

---

[3] None of the other federal immigration statutes referenced by Merola poses any threat of prosecution to him. *See Kearns*, 2019 WL 5849513, at *8 n.3. 8 U.S.C. § 1324a authorizes civil and criminal penalties, but only against *employers* for knowingly hiring undocumented workers. And 8 U.S.C. §§ 1373 and 1644 are not subject to any civil or criminal enforcement at all, nor do they place any affirmative reporting obligations on Merola. *See* H.R. Rep. No. 104-725 at 383 (1995-1996) (Conf. Rep.) (explaining that § 1644 "does not require, in and of itself, any government agency or law enforcement official to communicate with" immigration officials).

[4] These States include: California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Nevada, New Mexico, Oregon, Utah, Vermont, and Washington. *See* Br. of Amici States at 8, *Kearns v. Cuomo*, No. 19-cv-902 (W.D.N.Y. Aug. 23, 2019) (ECF No. 35). Some of these States also have similar confidentiality provisions prohibiting the disclosure of licensee information. *See* Nev. Rev. Stat. Ann. § 481.063(10); Cal. Veh. Code § 12800.7(b).

Merola's claim of threatened prosecution finds no support in President Trump's threat to prosecute a municipal official for obstruction based on her conduct in publicizing a planned raid by immigration authorities. Compl. ¶ 37. That threatened prosecution never materialized, and in any event implicated conduct utterly unlike anything required of a clerk issuing driver's licenses. *See Kearns*, 2019 WL 5849513, at *10. Similarly, the personal opinion of one immigration official that local lawmakers who vote for legislation limiting voluntary cooperation with federal immigration enforcement should be charged with unspecified crimes (Compl. ¶ 37 & n.19) fails to establish that Merola faces a threat of criminal prosecution for harboring or inducing; that immigration official has no responsibility for enforcing federal criminal laws, and his baseless statement was in any event not aimed at persons like Merola, who had no role in passing the Act.

Merola cannot show a credible threat of prosecution for harboring or inducing for the additional reason that complying with the Act entails neither the mental state nor the conduct required for such violations. *See Bordell v. General Elec. Co.*, 922 F.2d 1057, 1060 (2d Cir. 1991) (no standing where plaintiff had "no reason" to fear prosecution for inapplicable law). Merola fails to explain how processing standard license applications would provide him with knowledge of an applicant's immigration status (or expose him to a claim of acting in reckless disregard of a person's unlawful status), as required for a violation of § 1324(a)(1)(A). The Act forbids DMV agents from inquiring about immigration status. *See* VTL § 502(8)(e). And as the *Kearns* court observed, "the mere fact that an individual does not have a social security number provides no meaningful information about that individual's immigration status." 2019 WL 5849513, at *8. Presenting a foreign passport or consular document, or a foreign driver's license, similarly does not support any reasonable inference that the applicant is unlawfully present. *See id.* n.6.

There is also no basis for Merola's unwarranted assumption that anyone who applies for a

14

standard license under the Act must be unlawfully present. To the contrary, *any* state resident, regardless of citizenship or immigration status, may opt to apply for a standard license, and there are ample reasons why persons who are lawfully present might choose to do so. Indeed, many applicants who would otherwise qualify for REAL ID licenses—whether citizens or lawfully present noncitizens—may opt for standard licenses to avoid the more onerous documentation requirements imposed by federal law.

Merola's new allegation (Merola Decl. ¶ 11) that applicants have on past occasion informed him of their expired visas does not support his standing claim.[5] Individuals may have had reason to openly disclose their particular immigration status (e.g., visa holder) when applying for a driver's license in the past because differences in a person's category of lawful immigration status have been relevant to the type of license that person may obtain and how those licenses may be renewed.[6] But the Act makes immigration status irrelevant, and thus individuals will no longer have a reason to disclose immigration status information to Merola when applying for standard licenses under the Act.

But even if Merola had the requisite knowledge for a harboring offense, he would not commit the act of harboring just by issuing driver's licenses under a duly enacted state law. Merola argues that by issuing licenses to undocumented immigrants, he will be facilitating their continued presence in the U.S. But the Second Circuit has expressly rejected that theory of harboring—

---

[5] As a matter of federal immigration law, Merola is wrong when he states that having an expired visa necessarily means that the noncitizen is "here illegally" (Merola Decl. ¶ 11). To the contrary, both federal law and DHS regulations contemplate that certain individuals with expired visas may nevertheless have "lawful status" based on other circumstances that Merola would have no reason to know. *See* 6 C.F.R. § 37.3; *see also, e.g.*, 8 U.S.C. § 1255(i) (permitting certain unlawfully present persons to adjust to lawful permanent resident status).

[6] For example, individuals in the U.S. pursuant to a visa may obtain "temporary visitor" licenses. *See* DMV, *Temporary Visitor with an Expiring Driver License, Permit, or ID Card*.

making clear that § 1324(a)(1)(A)(iii)'s prohibitions do not extend to just any conduct that arguably facilitates a noncitizen's continued unlawful presence, unless that facilitation was done specifically "to help prevent the alien's detection by immigration authorities or police." *See United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("mere" provision of "shelter, money, or other material comfort" not enough to violate statute). Other courts of appeals have similarly concluded that the prohibition on harboring does not reach conduct which assists an undocumented individual in the incidents of daily life—such as the provision of housing or transportation—even if the assistance is provided with knowledge of the person's unlawful status (which Merola will not even have here). *See DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247-49 (3d Cir. 2012) (rejecting claim that landlords harbored unlawfully present immigrants by renting apartments); *United States v. Costello*, 666 F.3d 1040, 1042-43 (7th Cir. 2012) (defendant who drove unlawfully present boyfriend from bus station to her home and allowed him to stay with her for several months did not violate § 1324(a)(1)(A)(iii)).

Merola's claim of threatened prosecution (Mem. at 8-9) for inducing noncitizens to remain in the country fails for similar reasons. Indeed, Merola does not and cannot plausibly allege that providing undocumented persons with driver's licenses "served as a catalyst for [them] to reside in the United States in violation of immigration law when they might not have otherwise." *See DelRio-Mocci*, 672 F.3d at 249 (landlords did not encourage unlawfully present tenants to remain in country in violation of § 1324(a)(1)(A)(iv) by renting apartments).

Nor do the Act's nondisclosure and notification provisions (VTL § 201(12)(a)) support standing. As an initial matter, Merola has no standing to challenge the nondisclosure provision of the Act because his claim of injury is not "fairly traceable" to these portions of the statute, nor is it "likely to be redressed" by the injunction he seeks. *See Hollingsworth*, 570 U.S. at 704. As

16

explained above, preexisting DMV policies already prohibit Merola from using DMV records and information for purposes unrelated to DMV business, such as immigration enforcement. Thus, even if declining to respond to a request for the personal information of a license applicant from federal immigration authorities could expose Merola to a risk of criminal prosecution, that threat will not be removed by a court order enjoining the challenged provisions of the Act since Merola will still be bound by existing DMV policies that he does not challenge.

The Act's notification provision also does not help Merola because he "has not alleged a plausible scenario where he personally would be required to notify an individual about a record request received from immigration officials." *See Kearns*, 2019 WL 5849513, at *10. Under longstanding DMV policy, only DMV's central office in Albany is authorized to accept service of court orders, subpoenas, and judicial warrants. Merola does not allege that he has ever received a request for information from immigration authorities in the past. Nor would Merola have any way to "glean from the face of the request that there was a substantial risk it pertained to an individual who was in this country unlawfully" so as to violate § 1324(a). *See id.*

*Third*, Merola's speculative allegations of threats to national security purportedly arising from the Act are insufficient to establish standing. Those purported harms do not directly impact Merola, either in his official or individual capacities, and thus can cause him no injury distinct from that of the "general interest common to all members of the public." *See Spokeo, Inc. v Robins*, 136 S. Ct. 1540, 1552 (2016) (Thomas, J., concurring). And his complaints about the security threats stemming from the issuance of standard licenses are misplaced in any event: Congress implemented the recommendations of the 9/11 Commission about federal identification standards by enacting the REAL ID Act, and that federal statute expressly permits States to do precisely what Merola challenges here—that is, to issue driver's licenses and identifications without regard to immigration

status. *See* REAL ID Act, § 202(d)(11). And the social security number requirement for driver's licenses was added by the Legislature in 1995, years before the events of 9/11, for reasons unconnected to national security. See *supra* at 2. Merola's personal opinion (Compl. ¶ 64; Merola Decl. ¶ 18) that the State's design for its standard license is too easily confused with REAL ID licenses is irrelevant: the State's design fully complies with federal standards and has been approved by DHS as being sufficiently distinguishable from REAL ID-compliant licenses, and DMV has been issuing licenses with this DHS-approved design since October 2017.[7]

**Fourth**, Merola cannot manufacture standing by relying on baseless claims that the Act will enable widespread voter registration fraud and unlawful voting, in which he will be complicit. To the contrary, as Merola acknowledges (Merola Decl. ¶¶ 32-34), the requirement that all persons be offered the opportunity to register to vote when applying for a driver's license long predates the Act, and arises from preexisting federal and state law that he does not challenge. *See* 52 U.S.C. § 20504(c)(1); N.Y. Elec. Law § 5-212(1). Under the current system, to register to vote, applicants must attest, subject to substantial criminal penalties (see *supra* at 4), that they are citizens and satisfy all other eligibility criteria. The electronic voter registration applications are then sent directly by DMV to local boards of elections for their review and verification. County clerks, as DMV agents, act merely as conduits of these applications, and are prohibited by federal and state law from making "any statement to an applicant or tak[ing] any action the purpose or effect of which is to discourage the applicant from registering to vote." *See* 52 U.S.C. § 20506(a)(5)(C); N.Y. Elec. Law § 5-212(11); MacDonald Aff. ¶ 19. The Act does not alter these longstanding procedures.

---

[7] *See* DHS, *REAL ID Enforcement: New York* (last updated Sept. 5, 2019) ("New York is compliant with the REAL ID Act"), https://www.dhs.gov/real-id/new-york; DMV, *Federal REAL ID* ("New York State DMV began issuing REAL ID licenses, permits, and ID cards on October 30, 2017"), https://dmv.ny.gov/driver-license/federal-real-id.

That ineligible voters may—inadvertently or otherwise—register to vote has long been a possibility, and has nothing to do with the Act. Nor is that possibility unique to unlawfully present persons; rather, it exists for citizens under eighteen years of age, citizens convicted of felonies, and the many categories of *lawfully* present noncitizens—all of whom are ineligible to register to vote yet have been applying for driver's licenses in the State (and throughout the U.S.) for many years. *See also Kearns*, 2019 WL 5849513 at *9. And even though noncitizens in New York (and in other States) have long been given the opportunity to register to vote when applying for driver's licenses, Merola has not identified a single instance of improper voter registration by a noncitizen in any State through this process. Nor has he alleged that *any* DMV official in *any* State has been prosecuted merely for making voter registration applications available and transmitting those applications to election officials. Under these circumstances, Merola has failed to support his conclusory assertion (Mem. at 13-14) that the Act will make him complicit in voting fraud and expose him to a threat of prosecution for the same.

**Fifth and last**, Merola lacks standing based on his claim that complying with the Act will put him in the dilemma of either violating his oath of office (if he complies with the Act) or facing removal from office (if he does not). The "oath of office" theory posits standing where an official is faced with the choice of either violating his oath of office to support the state and federal constitutions if he administers a challenged law, or facing adverse consequences if he does not. *See Board of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State Teachers Ret. Sys.*, 60 F.3d 106, 111-12 (2d Cir. 1995).

Merola faces no such dilemma here. On the one hand, complying with the Act does not conflict with any provisions of the state and federal constitutions. Merola's mistaken subjective "belief . . . that a state statute is in violation of the federal constitution" is insufficient to establish

19

standing under this doctrine. *See Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765, 774 (5th Cir. 1978).

On the other hand, Merola has identified no adverse consequences from failing to implement the Act that are anything other than highly speculative and premature. Though he asserts the potential of removal from office and loss of licensing revenues, these harms are too remote to support standing. *See Board of Educ.*, 60 F.3d at 112 (no "realistic threat of harm" exists from noncompliance with challenged law where there is no claim that "any actual threat has been made to remove [plaintiffs] from their positions"). Not every refusal to perform official duties results in removal from office, and like the plaintiff in *Kearns*, Merola has not alleged that "any county clerk in New York's history has been removed from office" for failing to comply with a statute, or that defendants have "indicated any plans to seek such a removal should he refuse to comply with [the Act's] mandates." *See Kearns*, 2019 WL 5849513, at *12. The Governor and Attorney General's generalized assurances that they will enforce the law are insufficient to show a certain and impending threat of removal. *See id.*; *Poe v. Ullman*, 367 U.S. 497, 501 (1961) (Attorney General's statement that plaintiff's conduct was proscribed by law and that he "intends to prosecute any offenses against [state] law" failed to confer standing). That a different Governor and a different DMV Commissioner, more than a decade ago, warned county clerks that refusing to issue driver's licenses to immigrants in contravention of an executive directive would violate civil rights laws and expose clerks to suits for such violations (*see* Ex. A to Merola Decl. at 5) does not support Merola's claim that he faces any credible threat of removal from office today.

## C.      Merola Does Not Have a Viable Claim Under the Supremacy Clause.

Even if Merola had capacity and standing to bring his claims, his complaint should be dismissed at the outset for the additional reason that he has not stated an enforceable claim. Citing

20

alleged conflicts between the Act and various federal immigration statutes, Merola claims the Act is preempted under the Supremacy Clause. Compl. ¶ 38. As the Supreme Court has explained, however, the Supremacy Clause does not create a cause of action or confer any individual rights. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015). Rather, it is merely a "rule of decision" that "instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court" and under what circumstances. *Id.*

Merola's Supremacy Clause claim fails because the underlying federal immigration statutes that he relies on were not intended to be enforced by either private parties or local officials. Courts have long recognized that the federal government is the exclusive enforcer of the federal immigration laws, and have consistently held that the immigration provisions do not confer any private causes of action. *See, e.g.*, *Chavez v. Freshpict Foods, Inc.*, 456 F.2d 890, 893 (10th Cir.) (plaintiffs' discontent with federal government's "grossly inadequate" enforcement of immigration laws did not provide basis to "by-pass the enforcement procedures" set forth in federal law where "Congress has revealed no intention to" create private remedy in immigration statutes), *cert. denied*, 409 U.S. 1042 (1972); *Flores v. George Braun Packing Co.*, 482 F.2d 279, 280 (5th Cir. 1973) (per curiam) (no private right of action exists under 8 U.S.C. § 1324); *Piscitelli v. Classic Residence by Hyatt*, 408 N.J. Super. 83, 104 (App. Div. 2009) (same, as to § 1324a); *Johnson v. Hurtt*, 893 F. Supp. 2d 817, 838-40 (S.D. Tex. 2012) (same, as to §§ 1373 and 1644).

### D.   Alternatively, Merola's Preemption Claims Fail on the Merits.

#### 1.   The Act is presumed valid because it regulates on matters of traditional state interest.

While Congress has the power to preempt state and local laws under the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, courts have consistently recognized that there is a general

presumption against preemption. *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). This presumption "is especially strong" with respect to state laws that implicate a State's traditional police powers. *See Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 356 (2006).

While Congress has narrowly preempted state laws with respect to the naturalization, entry, and removal of individuals from the U.S., States retain the ability to enact and enforce generally applicable laws addressing "essentially local problems." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). States thus are broadly permitted to legislate with respect to civil rights, consumer protection, or workplace safety for *all* persons within their borders, including undocumented immigrants. *See id.* at 355-56; *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (undocumented persons are "subject to the full range of obligations imposed by the State's civil and criminal laws"). Indeed, federal law recognizes that States are empowered to issue driver's licenses without regard to immigration status. *See* Pub. L. No. 104-208, § 502(a), 110 Stat. 3009-671 (1996) (providing States "may conduct pilot programs within their State to determine the viability, advisability, and cost-effectiveness of the State's denying driver's licenses to aliens who are not lawfully present in the United States").

Here, the Act is entitled to the strong presumption against preemption because it regulates in an area of "traditional state concern"—that is, the issuance of driver's licenses. *See Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 973 (9th Cir. 2017). The New York Legislature determined that the State's economic and public safety interests are furthered if "all residents of New York, including undocumented immigrants," are able to secure driving privileges. *See* N.Y. Assembly, Sponsor's Mem. in Support of Legislation. In particular, the Act's supporters stressed during debates that permitting more state residents, including undocumented persons, to become licensed drivers would generate additional tax and DMV revenues, and lower uninsured motorist

22

insurance premiums for all drivers by reducing the number of uninsured drivers on New York's roads. *See* N.Y. Assembly Debates on Bill A3675B at 113, 115-116, 193, 195-96 (June 12, 2019).

The legislative history also contains myriad references to the expected gains to public safety that the Act would generate. *See id.* at 69, 120, 193, 207 (June 12, 2019). Legislators noted that there were many undocumented immigrants already in the State, many of whom were likely driving without licenses. *See id.* at 197-98, 210, 215-16. The Act's supporters stated that allowing these individuals already on the roads to be licensed would incentivize those persons to take road tests in order to become properly licensed, thereby enhancing overall road safety. *See id.* at 196, 210, 216. Because it is estimated that uninsured and unlicensed drivers are responsible for many hit-and-run accidents, supporters of the Act, based on data from other States that have passed similar measures, stated that the new law, by decreasing the number of such drivers, would improve public safety by decreasing hit-and-runs and other accidents. *See id.* at 109; *see also* Br. of Amici States at 12-15 (*supra* n.4) (attesting to safety gains and lower insurance premiums).

For these reasons, the Act falls squarely within the State's traditional police powers. *See Mackey v. Montrym*, 443 U.S. 1, 17 (1979) (State has a "paramount interest" in "preserving the safety of its public highways" by regulating those able to drive on its roads); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."). The Act accordingly enjoys a strong presumption of validity.

>     **2.    The Act's nondisclosure and notification provisions fall within the State's traditional licensing function.**

The Act's public safety and economic goals cannot be realized, however, unless the persons whom the Act makes newly eligible for driver's licenses come forward to apply for them. And it

is well recognized that "uncertainty among immigrant families regarding the confidentiality of information provided to states and the fear that states may provide information . . . to [federal immigration authorities]" may deter noncitizens from fully accessing government benefits or participating in society. *See* Letter from U.S. Dep't of Health & Human Servs. and U.S. Dep't of Agric. to State Health & Welfare Officials (Sept. 21, 2000) (noting that such fears pose a "barrier" for "eligible persons who live in immigrant families" to access benefits).[8]

To mitigate these chilling effects, many States and localities, as well as the federal government, have adopted laws and policies restricting inquiries about immigration or citizenship status unless such information is directly relevant to the particular governmental function at issue. Many such policies also prohibit officials from disclosing immigration status or citizenship information obtained in the course of government business for purposes unrelated to the official functions of the agency in possession of the information.[9] For example, some police departments restrict the collection and disclosure of immigration-status information to encourage immigrant crime victims or witnesses—including those "who are here unlawfully . . . or who have friends or family members here unlawfully"—to come forward without fear that doing so "will bring the scrutiny of the federal immigration authorities to their home." *See City of Chicago v. Sessions*, 888

---

[8]  https://www.hhs.gov/civil-rights/for-individuals/special-topics/needy-families/triagency-letter/index.html.

[9]  *See, e.g.*, Nev. Rev. Stat. Ann. § 481.063(10) (prohibiting release of "any information relating to legal presence or any other information relating to or describing immigration status, nationality or citizenship" of drivers and license applicants "to any federal, state or local governmental entity for any purpose relating to the enforcement of immigration laws"); Wash. Rev. Code Ann. § 10.93.160(4) (prohibiting inquiries about immigration status by state and local law enforcement agencies); 77 Fed. Reg. 17144, 17164-17165 (Mar. 23, 2012) (U.S. Department of Health and Human Services describing promulgation of regulation (42 C.F.R. § 435.907(e)(1)) as "codifying the longstanding policy" of prohibiting inquiries about immigration status of household members not applying for benefits "to avoid deterring enrollment of eligible applicants" and potential "chilling effect").

F.3d 272, 280 (7th Cir.) (discussing Chicago Police Department policies), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. 2018).

New York similarly prohibits its executive officials from inquiring about immigration status except where the status is "necessary to determine" the person's "eligibility for a program, benefit, or the provision of a service." *See* 9 N.Y.C.R.R. § 8.170 (Exec. Order No. 170) at B.1.a. Officials are also prohibited from disclosing an individual's personal information to "federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." *Id.* at B.2. And California, which has allowed the issuance of driver's licenses irrespective of immigration status since 2015, recently amended its laws, *see* Cal. Veh. Code § 12800.7(b), to strengthen confidentiality protections in response to, among other things, "evidence that [residents] are avoiding or withdrawing from state and local government programs in order to protect the privacy of their personal information."[10] *See also City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) (observing that expectation of confidentiality may be necessary in order to obtain information that is "essential" to the performance of many government functions).

The Act's nondisclosure and notification provisions are intended to prevent these confidentiality concerns from undermining the Act's goals. Consistent with preexisting state confidentiality policies, the nondisclosure provisions prohibit DMV from sharing the personal information of standard license holders and applicants with third parties for purposes unrelated to licensing, but permit disclosure where mandated by law—that is, via a court order, judicial warrant, or subpoena, or where disclosure is required under the REAL ID Act. *See* VTL § 201(9)(a)-(c), (10)(a)-(c), (12)(a). The Act also allows disclosure of driver and applicant personal information

---

[10] *See* Cal. Senate Rules Comm., Senate Floor Analyses for SB 244, at 6 (Aug. 31, 2018), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB244#.

where the information sharing is "pursuant to a cooperative arrangement between city, state and federal agencies" unrelated to immigration enforcement. *See id.* § 201(12)(b)(ii). The nondisclosure provisions reflect the Legislature's attempt to balance individual privacy and governmental interests, and reassure eligible license applicants that their personal information will be kept confidential and not shared with immigration authorities to the extent permitted by law.

The notification provision, which requires DMV to notify individuals upon receipt of a court order, judicial warrant, or subpoena seeking personal information, serves a similar purpose. Such provisions are commonplace: the government is mandated in a variety of contexts to provide notice to persons when it requests their personal information from third parties. *See, e.g.*, 18 U.S.C. § 2703(b)(1)(B) (notification required when seeking electronic communications from communications provider pursuant to administrative warrant); 12 U.S.C. § 3405(2) (notification required when seeking financial records through administrative subpoena or summons). These provisions recognize that individuals have privacy interests in their personal information, and seek to "strike a balance" by providing individuals the opportunity to assert their privacy interests when a request for their personal information is made, while permitting legitimate law enforcement activity. *See, e.g.*, *Anderson v. La Junta State Bank*, 115 F.3d 756, 758 (10th Cir. 1997); *Hohman v. Eadie*, 894 F.3d 776, 782 (6th Cir. 2018). There is thus no basis for Merola's suggestion that the notification provision will help the subject evade detection from federal authorities. *See, e.g.*, *In re Grand Jury Subpoena to Facebook*, Nos. 16-mc-1300 to 1314, 2016 WL 9274455, at *4 (E.D.N.Y. May 12, 2016) (rejecting government's contention that generally notifying subjects of subpoenas "necessarily will lead to obstruction").

### 3.   The Act is not subject to field preemption.

Field preemption has the effect of displacing state regulation in a particular area where

Congress has asserted the exclusive authority to regulate in that area. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). Where "the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be clear and manifest." *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990).

Congress has not expressed a clear and manifest intent to preempt state laws governing the issuance of standard driver's licenses. Merola suggests (Compl. ¶¶ 39-40, 72-74, 78(a)) that the Act is subject to field preemption because Congress has the exclusive power to "regulate immigration" (*id.* ¶ 73), and has comprehensively regulated in the field of "the employment of illegal aliens" (*id.* ¶ 48). But the Act does not regulate immigration: it neither confers any immigration status nor admits or denies admission to any class of individuals. *See DeCanas*, 424 U.S. at 355. Nor does the Act confer any work authorization in contravention of federal law. Merola's assertion (Mem. at 5) that courts have found the proscriptions in § 1324(a)(1)(A) to have a field-preemptive effect is of no assistance to him: the relevant field is harboring and inducing persons to remain in the U.S. The Act, by contrast, concerns the issuance of driver's licenses—specifically the types of proof of identity and age that DMV must accept and how DMV may handle applicants' personal information. It thus "occup[ies] an entirely different field" from federal immigration law, *see Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 240 (2d Cir. 2006), and is not field-preempted. *See id.* at 240, 242 (§ 1324a's prohibitions against employment of undocumented workers did not preempt state labor law which allowed unauthorized worker to recover lost wages in tort actions).

Merola is also wrong when he contends that the statements of some legislators that the Act was intended to benefit undocumented immigrants in going about their daily lives (including getting to and from work) invalidate the law. Compl. ¶ 49. These statements do not turn the Act

into a law that regulates immigration. As noted above, Congress's exclusive authority to regulate the naturalization, entry, and removal of individuals from the U.S. does not displace States' authority to legislate on local issues, nor does it transform "every state enactment which in any way deals with aliens" into a "regulation of immigration" that is "per se pre-empted," *DeCanas*, 424 U.S. at 355. Absent an express congressional statement to the contrary or an independent constitutional bar, States are free to enact laws (like the Act) addressing the impact of undocumented immigrants—whether to assist immigrants or to mitigate the impacts of their presence. *See Balbuena*, 6 N.Y.3d at 359 (federal immigration laws "'do not purport to intrude into the area of what protections a State may afford these aliens'").

### 4.   The Act does not conflict with any federal statutes cited by Merola.

Conflict preemption occurs either where it is "physically impossible" to comply with both state and federal law, *see, e.g.*, *Mutual Pharms. Co. v. Bartlett*, 570 U.S. 472, 503 (2013), or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *see, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). To invalidate a state enactment on the obstacle theory of conflict preemption, "the conflict between state law and federal policy must be a 'sharp' one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)).

**a. Section 1324a (employment).** No provision of the Act interferes with 8 U.S.C. § 1324a, which makes it "unlawful for a person or other entity" to knowingly employ a person who is not legally authorized to work. *See* 8 U.S.C. § 1324a(a)(1). In crafting § 1324a, Congress chose to deal with the problems of illegal immigration and the employment of undocumented persons in a particular way—by making the "deliberate choice" to regulate only the conduct of *employers* rather than workers themselves or others who facilitate the unlawful employment. *See Arizona*, 567 U.S.

at 404-05. Under § 1324a, it is only a crime for employers to knowingly hire or recruit workers without work authorization; it is not a crime for an undocumented worker to obtain or maintain employment, unless the employment was procured through fraudulent means. *See* 8 U.S.C. §§ 1324a, 1324c. Congress deliberately opted to omit from its "comprehensive" regulatory framework conduct that facilitates unlawful hiring, *see Arizona*, 567 U.S. at 404, and thus it cannot have intended for § 1324a to broadly displace any provision of state law that could arguably make it easier for unauthorized immigrants to find or maintain work, *see United States v. California*, 921 F.3d 865, 881-82 (9th Cir. 2019) (state law requiring employers to provide employees with advance notice of immigration inspections does not conflict with § 1324a because it does not "permit employers to hire individuals without federally defined authorization, or impose sanctions inconsistent with federal law"). Indeed, Congress expressly addressed preemption in § 1324a, preempting only "any State or local law imposing civil and criminal sanctions . . . upon those who employ . . . unauthorized aliens." 8 U.S.C. § 1324a(h)(2). It did not broadly preempt state laws or policies making it easier for undocumented workers to be employed. Had Congress believed that all such laws "posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision." *See Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) (Congress's non-inclusion of express preemption provision signals its intent not to broadly preempt state laws).

Here, the Act does not regulate any *employer* conduct, or permit *employers* to hire workers if not authorized under federal law. Because the Act does not confer work authorization on license holders, and because the licenses issued pursuant to the Act must state on their face "Not for Federal Purposes," *see* VTL § 502(8)(a), the statute also does not facilitate employees in deceiving employers to obtain employment. *See also id.* § 502(8)(e)(i) (stating that standard licenses "shall not be used as evidence of a person's citizenship or immigration status"). Merola's suggestion that

the Act is invalid because it may facilitate employment by state residents who lack work authorization (Compl. ¶ 49) ignores that DMV has long issued driver's licenses to this category of residents, *see Cubas*, 8 N.Y.3d at 617-18, a practice that Merola does not challenge. In any event, the mere possibility that issuing driver's licenses to undocumented workers may make it easier for the *workers* to find and maintain work does not present an "irreconcilable conflict" with a federal law that targets *employers*. *See Madeira*, 469 F.3d at 241-42.

      **b. Section 1324(a)(1)(A)(iii), (iv) (harboring and inducing).** As explained above, complying with the Act would not implicate federal prohibitions against harboring unlawfully present persons or encouraging such persons to remain in violation of law. On the one hand, under the scheme established by the Act, there will be no opportunity for Merola to know whether any particular applicant is unlawfully present or if their continued presence would violate immigration law, and thus he will lack the requisite knowledge for a § 1324(a)(1)(A) offense. On the other hand, even if Merola had such knowledge, simply declining to report an applicant's unlawful presence to federal authorities in the absence of any affirmative obligation to do so would not violate § 1324(a). *See DelRio-Mocci*, 672 F.3d at 247-48 (doing "nothing to alert federal authorities" did not violate harboring prohibition). Nor can Merola plausibly allege that the mere opportunity to obtain a driver's license under the Act would encourage undocumented persons to continue to reside in the country unlawfully when they otherwise would have left.

      Merola's preemption challenge to the notification provision in VTL § 201(12)(a)—which requires DMV to notify the subjects of subpoena, judicial warrant, or court order requests for information from immigration authorities—similarly fails. Not only is it highly unlikely that the notification requirement will ever implicate Merola since county clerk offices are not authorized to accept the above requests, there is also no basis to assume that the subjects of the requests are

unlawfully present. *See Kearns*, 2019 WL 5849513, at *10. Nor has any court held that merely notifying the subject of a request for information by immigration authorities constitutes unlawful harboring or concealment. *Cf. United States v. Herrera*, 584 F.2d 1137, 1141-42 (2d Cir. 1978) (to hide undocumented workers employed in their club, defendants installed cameras and alarm system to warn workers, and instructed workers to escape from club or disguise themselves if immigration authorities appeared); *see also California*, 921 F.3d at 881-82 (rejecting claim that state law mandating advance notice of immigration inspections by employers was preempted simply because state law made federal inspections more difficult).

c. **Sections 1373 and 1644 (information-sharing).** There is also no merit to Merola's contention (Compl. ¶¶ 44-46, 50) that the Act's nondisclosure provisions conflict with the restrictions on information-sharing between state and local governments and federal immigration authorities contained in 8 U.S.C. §§ 1373(a) and 1644. Sections 1373 and 1644 prohibit state and local governments from establishing any rules or policies that restrict information-sharing between state and local entities and their officials, on the one hand, and federal immigration authorities, on the other.[11] These statutes "prohibit state and local governments from limiting their employees in the *voluntary* provision of information about the immigration status" to federal officials, but do not create any affirmative disclosure obligations. *See City of New York*, 179 F.3d at 30, 35 (emphasis added); *see also* H.R. Rep. No. 104-725 at 383 (1995-1996) (Conf. Rep.) (explaining that § 1644

---

[11] The portion of § 1373 relied on by Merola (Compl. ¶ 45) provides: "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 1644 is virtually identical to § 1373, except it concerns the exchange of information between state and local governments and the federal authorities "regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

"does not require . . . any government agency . . . to communicate with" immigration officials).

The Act's nondisclosure provisions are consistent with the federal policies concerning the protection of driver information embodied in the federal Drivers Privacy Protection Act (DPPA). *See generally* 18 U.S.C. § 2721 et seq. Originally enacted in 1994, *see* Pub. L. No. 103-322, § 300002(a), 108 Stat. 2099 (1994), the DPPA generally protects against the disclosure of driver personal information, but requires States to report such information in certain circumstances, for instance in matters of motor vehicle or driver safety and theft. By contrast, the DPPA gives a state DMV the choice as to whether to report otherwise protected personal information to other state and federal agencies in carrying out agency functions: it provides that States "may"—but are not obligated to—disclose such information to these agencies. *See* 18 U.S.C. § 2721(b)(1). By passing the Act, the New York Legislature exercised its prerogative under the DPPA to decline to share immigration status information with federal agencies. In particular, the Act prohibits DMV from inquiring about an applicant's citizenship or immigration status during the application process, recording such information, and responding to federal immigration requests for personal information about standard licensees and applicants. *See* VTL §§ 502(8)(c), (e)(ii), 201(12).

The Act's nondisclosure provisions further reflect the Legislature's permissible exercise of its Tenth Amendment "right of refusal" to participate in immigration enforcement, and such a choice "cannot be invalid under the doctrine of obstacle preemption," even if it may make federal efforts more difficult. *See California*, 921 F.3d at 888-91. The Legislature was entitled to make these choices concerning the use of state resources and the manner in which state officials carry out their duties.

In any event, the Act does not conflict with §§ 1373(a) and 1644 because it does not require applicants for standard licenses to submit information about immigration classification in the first

place—the only information covered by §§ 1373(a) and 1644, *see id.* at 891-93. Nor will there be any opportunity for DMV officials to learn such information in performing their duties. *See* VTL § 502(8)(c)(iii), (e)(ii). Because DMV is not authorized to collect immigration status information from applicants to begin with, *see id.* § 201(12)(a), the Act's prohibition on the disclosure of such information to federal authorities do not conflict with § 1373(a).

Even if the Act's nondisclosure provisions did conflict with §§ 1373 and 1644, these federal laws cannot preempt state law because they are unconstitutional. As several district courts have found in the wake of the Supreme Court's decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), § 1373 violates the Tenth Amendment's anti-commandeering principle by impermissibly telling state and local legislatures that they may not enact laws or rules governing how state and local government employees handle immigration status information acquired in the course of official duties.[12]

**d. Federal and State Voter Registration Laws.** Finally, the Act does not conflict with any voter registration laws. Longstanding federal and state law mandates that DMV offer the opportunity for every driver's license applicant to register to vote, and transmit all registration applications to local boards of elections for processing and verification. Both before and after the Act takes effect, all persons who make false statements in connection with voter registrations are subject to substantial criminal penalties, and noncitizens who engage in such wrongdoing are

---

[12] *See, e.g.*, *New York v. Department of Justice*, 343 F. Supp. 3d 213, 233-37 (S.D.N.Y. 2018) (§ 1373 is unconstitutional under *Murphy*); *City and County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 949-53 (N.D. Cal. 2018) (same). In light of *Murphy*, Merola is mistaken that the Second Circuit's decision in *City of New York* remains binding precedent. *See, e.g.*, *New York*, 343 F. Supp. 3d at 234 ("It is clear that *City of New York* cannot survive the Supreme Court's decision in *Murphy*"); *see also Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017) (district court not required to follow circuit precedent in light of later conflicting Supreme Court decision).

additionally subject to severe immigration consequences. DMV simply transmits electronic voter registration application to local boards of elections to assist election officials in fulfilling their statutory obligations; DMV and its agents otherwise have no role in the voter registration process. *See* MacDonald Aff. ¶ 18. Nor are county clerks like Merola even involved in the transmission of the electronic voter registration applications, which are done by central DMV systems. The Act does not change the preexisting statutory voter registration scheme, and simply does not implicate—let alone conflict with—any provision of state and federal voter registration laws.

## II.   PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION IN ANY EVENT

Even if this Court declines to dismiss the complaint, it should deny Merola's request for the "extraordinary remedy" of a preliminary injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Merola has not satisfied the well-settled standard for obtaining a preliminary injunction "against government action taken in the public interest pursuant to a statutory scheme." *See Pope v. County of Albany*, 687 F.3d 565, 570 & n.3 (2d Cir. 2012); *Winter*, 555 U.S. at 22.

As discussed in Point I, Merola has shown no likelihood of success on the merits, and the purported harms that he asserts are illusory and speculative. Nor can he establish that a preliminary injunction would serve the public interest and is favored by the equities; rather, both factors counsel against a preliminary injunction. *See New York State Rest. Ass'n v. New York City Bd. of Health*, 545 F. Supp. 2d 363, 368 (S.D.N.Y. 2008) ("The public interest . . . in enforcement of legislation enacted in the public interest, weigh[s] heavily against . . . a stay."). The injunction Merola seeks would deprive the State's residents of increased tax and licensing revenues, reduced insurance premiums, and improved road safety. Balanced against Merola's unfounded belief that complying with the Act would cause him to violate state and federal law, it would be against the public interest

to grant the broad injunctive relief that he seeks. *See Maryland v. King*, 133 S. Ct. 1, *3 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'").

## CONCLUSION

The Court should dismiss the complaint and enter judgment for defendants, or alternatively, deny plaintiff's motion for a preliminary injunction.


Dated:     New York, New York
           November 25, 2019

                                          Respectfully submitted,

                                          LETITIA JAMES
                                            *Attorney General*
                                            *State of New York*
                                          Attorney for Defendants


                                     By:   */s/ Linda Fang*
                                           Linda Fang
                                           Assistant Solicitor General

JEFFREY W. LANG
  *Deputy Solicitor General*
VICTOR PALADINO                            28 Liberty Street
  *Senior Assistant Solicitor General*     New York, NY 10005
LINDA FANG                                 (212) 416-8656
  *Assistant Solicitor General*
       *of Counsel*