UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

FRANK J. MEROLA, in his official capacity as
Clerk of the County of Rensselaer, New York,

                         Plaintiff,

      -against-

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York,
LETITIA A. JAMES, in her official capacity as
Attorney General of the State of New York, and
MARK J.F. SCHROEDER, in his official capacity as
Commissioner of the New York State Department of
Motor Vehicles,

                       Defendants.

Civil Action No.  1:19-cv-0899
(GLS/TWD)

───────────────────────────────

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION
TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

HARRIS BEACH, PLLC
Karl J. Sleight, Esq.
Elliot A. Hallak, Esq.
Kelly S. Foss, Esq.
*Attorneys for Plaintiff*
677 Broadway, Suite 1101
Albany, New York 12207
Tel: (518) 427-9700

Dated: December 2, 2019

## **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ............................................................................................................... 3

   A.   PLAINTIFF HAS STANDING AND CAPACITY TO CHALLENGE THE GREEN LIGHT LAW IN HIS OFFICIAL CAPACITY AS COUNTY CLERK. ............. 3

      1.   Plaintiff Has Standing to Challenge the Green Light Law ........................ 3

      2.   Plaintiff Has Capacity to Challenge the Green Light Law ........................ 9

   B.   PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION. ............................ 10

      1.   Plaintiff Can Challenge the Green Light Law on Preemption Grounds. ................ 10

      2.   Enacting the Green Light Law Exceeded the State's Police Powers. ...................... 11

      3.   The Green Light Law Is Preempted Based on Field Preemption Principles. ........... 13

      4.   The Green Light Law Is Preempted Based on Conflict Preemption Principles. .................................................................................................. 15

         i.   *8 U.S.C. §§ 1324(a)(1)(A)(iii) and (iv) – Criminal Harboring and Inducing* ...................................................................................... 15

         ii.   *8 U.S.C. §§ 1644 and 1373(a) – Prohibition on Information-Sharing Restrictions* ...................................................................... 18

         iii.  *Voting Laws* ............................................................................... 20

         iv.  *REAL-ID Act* ............................................................................... 22

         v.  *8 U.S.C. § 1324a – Employment of Illegal Aliens* ............................ 23

      5.   Plaintiff Demonstrated Irreparable Harm and that the Equities Favor Granting an Injunction. .......................................................................... 24

CONCLUSION ........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Aguayo v. Richardson,*
   473 F.2d 1090 (2d Cir. 1973) ............................................................................3, 4, 5

*Air Transp. Ass'n of Am., Inc. v. Cuomo,*
   520 F.3d 218 (2d Cir. 2008) ............................................................................... 10

*Arizona v. United States,*
   567 U.S. 387 (2012) ..........................................................................10, 14, 23, 24

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015) ......................................................................................10, 11

*Babbitt v. United Farm Workers Nat. Union,*
   442 U.S. 289 (1979) ............................................................................................ 8

*Baker v. Carr,*
   369 U.S. 186 (1962) ............................................................................................ 4

*Bd. of Ed. Of Cent. Sch. Dist. No. 1 v. Allen,*
   392 U.S. 236 (1968) ....................................................................................3, 4, 5, 7

*Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. N.Y.S. Teacher's Ret. Sys.,*
   60 F.3d 106 (2d Cir. 1995) ................................................................................ 5

*City of New York v. State of New York,*
   655 N.E.2d 649 (N.Y. 1995) .............................................................................. 9

*City of New York v. United States,*
   179 F.3d 29 (2d Cir. 1999) ................................................................................ 19

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................................ 7

*DelRio-Mocci v. Connolly Properties Inc.,*
   672 F.3d 241 (3d Cir. 2012) .............................................................................. 16

*Felder v. Casey,*
   487 U.S. 131 (1988) ............................................................................................ 23

*Finch v. Mississippi State Med. Ass'n, Inc.,*
   585 F.2d 765 (5th Cir. 1978), *modified*, 594 F.2d 163 (5th Cir. 1979)........................................ 6

ii

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
   841 F.3d 133 (2d Cir. 2016) ........................................................................ 11

*Ga. Latino Alliance for Human Rights v. Gov. of Georgia*,
   691 F.3d 1250 (11th Cir. 2012) .............................................................10, 14

*Hedges v. Obama*,
   724 F.3d 170 (2d Cir. 2013) .......................................................................... 7

*Hoffman Plastic Compounds, Inc. v. NLRB*,
   535 U.S. 137 (2002) ..................................................................................... 23

*Kearns v. Cuomo*, Index No. 1:19-cv-000902-EAW,
   Doc. 83 (W.D.N.Y. Nov. 9, 2019) .............................................3, 4, 7,  8

*Lozano v. City of Hazleton*,
   724 F.3d 297 (3d Cir. 2013) ........................................................................ 14

*Murphy v. National Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ................................................................................. 19

*New York State Citizens' Coal. for Children v. Poole*,
   922 F.3d 69 (2d Cir. 2019) .......................................................................... 11

*Poe v. Ullman*,
   367 U.S. 497 (1961) ....................................................................................... 8

*State of New York et al. v. Barr*,
   Case No 19-267 (2d Cir.) ............................................................................ 19

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) .................................................................. 14

*United States v. George*,
   779 F.3d 113 (2d Cir. 2015) ..................................................................14, 16

*United States v. Herrera*,
   584 F.2d 1137 (2d Cir. 1978) ...................................................................... 18

*United States v. Kim*,
   193 F.3d 567 (2d Cir. 1999) ....................................................................14, 16

*United States v. Locke*,
   529 U.S. 89 (2000) ....................................................................................... 12

*United States v. Ndiaye,*
    434 F.3d 1270 (11th Cir. 2006) ........................................................... 14

*United States v. Oloyede,*
    982 F.2d 133 (4th Cir. 1992) ............................................................... 14

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ..........................................................12, 14

*United States v. Ye,*
    588 F.3d 411 (7th Cir. 2009) ............................................................... 14

*UnitedHealthcare of New York, Inc. v. Vullo,*
    323 F. Supp. 3d 470 (S.D.N.Y. 2018) .................................................. 11

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ............................................8, 10, 12, 14

*Vermont Right to Life Comm., Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000) ................................................................. 8

*Virginia v. American Booksellers Ass'n,*
    484 U.S. 383 (1988) ............................................................................. 8

**Statutes**

8 U.S.C. § 1324a ...........................................................................15, 23

8 U.S.C. § 1324(a)(1)(A) ...................................................................... 15

8 U.S.C. § 1324(a)(1)(A)(iv) ................................................................. 17

8 U.S.C. § 1373(a) ............................................................................... 18

8 U.S.C. § 1324(a)(1)(A)(iii) ............................................................5, 15, 16

8 U.S.C. §  1324(a)(1)(A)(iv) .............................................................5, 15

8 U.S.C. § 1644 ...............................................................................5, 15, 18

8 U.S.C. § 1373(a) ...........................................................................5, 15, 18

18 U.S.C. § 241 ................................................................................6, 20

18 U.S.C. § 242 ................................................................................6, 20

18 U.S.C. § 2721(b)(1) ........................................................................ 9

52 U.S.C. § 10307(c) .................................................................................................6, 20

C.P.L.R. § 12(b)(6) ........................................................................................................ 9

C.P.L.R. § 12(c) ............................................................................................................ 9

N.Y. VTL § 201(12)(a) ..............................................................................9, 14, 17, 18

N.Y. VTL § 205(1)-(2) ................................................................................................ 20

N.Y. VTL § 501(2)(a)(iv) ........................................................................................... 13

N.Y. Constitution, Art. II, § 1 .................................................................................... 20

Pub. L. 109–13 § 11 ..................................................................................................6, 22

## PRELIMINARY STATEMENT

Defendants flippantly disregard national security, demonstrating utter indifference to the safety of United States citizens. Shockingly, they describe significant national security concerns— driven in large part by the harsh reality of the 9/11 attacks, which were carried out by illegal aliens who were able to "acquire[] some form of U.S. identification document . . . . [which] assisted them in boarding commercial flights, renting cars, and other necessary activities,"[1] and which left almost 3,000 dead and more than 6,000 injured — as "purported" and "illusory" harms, and "misplaced" concerns. Defendants do not address Mr. Merola's irreparable harm arguments other than to brush them off. They instead suggest that the State's interest in increased revenues and supposed "improved road safety" are more important to the "public interest" than national security.

Defendants willfully close their eyes to the fact that the Green Light Law affirmatively grants illegal aliens the ability to thwart federal authorities, and to freely work in and move throughout the country without ever having been vetted by Homeland Security. Congress has passed comprehensive federal laws designed to protect this country's citizens against outside threats, including against threats from terrorist and other criminal organizations. Congress has also enacted comprehensive laws designed to ensure that individuals from other countries must follow a process to legally immigrate to the United States. The rights and protections of citizenship are granted to immigrants only after they have followed the legal process for coming to this country, have been subjected to a thorough vetting process, and otherwise abide by this country's laws.

Through passage of the Green Light Law, New York is promoting a starkly different agenda—one which promotes open borders, induces illegal aliens to live and work in the country without undergoing any sort of vetting by Homeland Security, actively harbors illegal aliens against detection by federal authorities, assists illegal aliens in freely moving throughout the

---

[1] *See* Compl., at ¶ 58, citing 9/11 Commission Report, at 390.

country, and allows illegal aliens to add themselves to the voter rolls.  Mr. Merola, in his capacity as Rensselaer County Clerk, would be forced under the Green Light Law to participate in this State-sponsored scheme.  Defendants cannot dispute that the Green Light Law will grant illegal aliens the ability to drive vehicles capable of carrying up to 26,000 pounds nationwide.  Such vehicles are easily capable of transporting and hiding instruments of mass destruction, and would also facilitate other illicit smuggling activities which are unfortunately on the rise in this country, such as human trafficking[2] and drug trafficking.[3]

Defendants apparently have no qualms about infringing upon individuals' rights under federal law to cooperate with requests received from federal immigration authorities.  For example, if federal immigration authorities ask Mr. Merola for information pertaining to an individual believed to have engaged in criminal activity (*e.g.*, sex trafficking), Mr. Merola would be barred under the Green Light Law from responding to the request and from sharing any information he might have regarding the person's legal status.  Worse still, the Green Light Law would require him to affirmatively take steps to *warn* the suspect that federal immigration authorities had made such a request, thereby harboring the suspect against detection.

Further, and astonishingly, Defendants freely admit that under the Green Light Law, illegal immigrants will be given the opportunity to register to vote.  They force Mr. Merola to offer voter registration opportunities to illegal aliens, while encouraging him to simply rest assured that illegal

---

[2] In fiscal year 2018, Immigration and Customs Enforcement made over 1,500 arrests for human trafficking (97% for sex-trafficking), and reported an astonishingly high rate of child smuggling (20,000 children in one month). *See* https://www.dhs.gov/news/2019/03/06/humanitarian-and-security-crisis-southern-border-reaches-breaking-point.

[3] U.S. Customs and Border Protection (CBP) statistics reflect a narcotics and opioid crisis in the United States, facilitated by illegal aliens. https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.  Since 2015, nationwide seizures of cocaine and Methamphetamine each more than doubled (from 38,346 pounds to 89,207 pounds of cocaine seized, and from 25,495 pounds to 68,585 pounds of Methamphetamine seized), and seizures of Fentanyl increased from 70 pounds to 2,545 pounds.

aliens would never actually take advantage of the opportunity. Mr. Merola should not be forced to participate in this State-sponsored scheme to register illegal aliens to vote, and, under color of State law, to dilute the votes of qualified voters in violation of their constitutional rights.

Finally, Defendants' standing and capacity arguments are weak tea. Unable to refute that this Court has jurisdiction based on oath-of-office standing premised on well-established Supreme Court and Second Circuit precedent, Defendants instead burn a strawman in an attempt to suggest that this case is exactly like the *Kearns* case, where oath-of-office standing was not asserted.

Accordingly, this Court should deny Defendants' motion to dismiss and grant Mr. Merola's motion for a preliminary injunction.

## <u>ARGUMENT</u>

**A.    PLAINTIFF HAS STANDING AND CAPACITY TO CHALLENGE THE GREEN LIGHT LAW IN HIS OFFICIAL CAPACITY AS COUNTY CLERK.**

   1.    <u>Plaintiff Has Standing to Challenge the Green Light Law.</u>

This Court should deny Defendants' motion to dismiss under Rule 12(b)(1) and Rule 12(c) because Mr. Merola has unquestionably established oath-of-office standing to pursue his claims in his official capacity as County Clerk. Defendants do not dispute, and therefore concede, that this Court is bound to follow the Supreme Court ruling in *Allen* and the Second Circuit's ruling in *Aguayo* concerning oath-of-office standing. *See Bd. of Ed. Of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, n. 5 (1968); *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973). As set forth in Plaintiff's original motion papers (and not disputed by Defendants), those rulings make clear that where a state law requires a state official to engage in conduct which he believes violates his oath of office, that state official has Article III standing. *See* ECF 27-1, pp. 17-18 & n. 8. This is particularly true where (like the plaintiffs in *Allen*) he or she has alleged that he or she is likely to be removed from office or lose state funding in the event he or she fails to comply with the state

law in question. *Id.* Given that Mr. Merola has plainly established oath-of-office standing under binding Supreme Court and Second Circuit precedent, Defendants understandably avoid addressing this argument until page 19 of their brief. Defendants prefer instead to battle a strawman, in an apparent attempt to suggest that this case is the same as the *Kearns* case, where oath-of-office standing was not asserted. *See Kearns v. Cuomo*, Index No. 1:19-cv-000902-EAW, Doc. 83 (W.D.N.Y. Nov. 9, 2019).

The Supreme Court first recognized oath-of-office standing in *Allen*, 392 U.S. 236. In *Allen*, local school board members challenged a state law which required them to loan textbooks to parochial schools — something that, under "their interpretation," violated the establishment and free exercise clauses of the federal and State constitutions. *Allen*, 392 U.S. at 238-240. Appellants alleged that complying with the law would require them to violate their oaths of office, and that if they refused to lend books to parochial school students, they would likely be removed from office and would also suffer "a reduction in state funds for their school districts." *Id.* at n. 5. Based upon these allegations, the Supreme Court held "[t]here can be no doubt that [the local school board members] thus have a 'personal stake in the outcome' of this litigation." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Having found that the school boards had established Article III standing, the Supreme Court then reached the merits of the claims, ultimately holding that the school board members' interpretation was in fact incorrect, and that the state law in question did not actually violate the establishment or free exercise clauses. *Id.* at 248-49.

Following *Allen*, the Second Circuit also recognized oath-of-office standing in *Aguayo*, 473 F.2d 1090. The *Aguayo* case involved a lawsuit brought by, among others, the New York City Commissioner of its Department of Social Services. *Aguayo*, 473 F2d at 1093-94. The lawsuit challenged two state experimental work project programs on the basis that those programs violated

4

equal protection, due process, and were otherwise inconsistent with federal law.  *Id.* at 1098.  The Second Circuit held that the Commissioner had standing to assert constitutional and statutory claims because, "[l]ike the school board members in [*Allen*], he is faced with what he deems a conflict between his oath to support the United States Constitution and his duty under state law to carry out the New York projects."  *Id.* at 1100.

Notably, in *Aguayo*, the Second Circuit did not require as a prerequisite to oath-of-office standing any allegations that the Commissioner faced potential removal from office or a reduction of state funds for failure to comply with the state law.  *Id.*  The subsequent Second Circuit case relied upon by Defendants notably did *not* involve allegations of oath-of-office standing.  In *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. N.Y.S. Teacher's Ret. Sys.*, 60 F.3d 106 (2d Cir. 1995), the Second Circuit held that the plaintiffs failed to establish oath-of-office standing because they "d[id] not allege that compliance with state law will require them to violate their oaths to act constitutionally"; indeed, the plaintiffs were school employees who did not take oaths of office, and simply disagreed with certain state-mandated spending.  *Id.*

Here, Mr. Merola has plainly established oath-of-office standing because, under his good faith interpretation, implementing New York's Green Light Law would require him to break his oath of office to support the federal and State constitutions.  As more fully set forth in Mr. Merola's opening brief and Declaration, the Green Light Law requires him to elevate State law over federal law in violation of the Supremacy Clause by:

(1)     actively preventing the Rensselaer County Clerk's Office from cooperating with federal immigration authorities in violation of federal statute (8 U.S.C. §§ 1644 and 1373(a));

(2)     participating in a scheme to encourage and induce illegal aliens to reside in the United States in violation of federal statute (8 U.S.C. §§ 1324(a)(1)(A)(iii) and (iv));

(3)     issuing to illegal aliens licenses which fail to comply with federal standards under the REAL-ID Act (Pub. L. 109–13 § 11); and

(4)     participating in a scheme that opens voter registration to illegal aliens, thereby diluting the votes of qualified voters, in violation of their constitutional rights and in violation of multiple federal statutes (18 U.S.C. §§ 241, 242; 52 U.S.C. § 10307(c)), as well as in violation of the State Constitution (Art. II, § 1).

Defendants incorrectly argue that a state official's subjective belief that the state law in question violates the federal or state constitution does not suffice to grant oath-of-office standing. *See* ECF 30-1, p. 19.  Defendants' argument cannot be reconciled with the binding precedent set forth above.  In both *Allen* and *Aguayo*, oath-of-office standing was present because the plaintiffs *interpreted* or *deemed* the state laws in question to violate the constitution.  Indeed, in *Allen*, the Supreme Court held that the plaintiffs' "interpretation" of the law as violating the Constitution was sufficient to confer oath-of-office standing, even though that interpretation was ultimately found to be incorrect once the Court reached the merits.  The *Finch* decision relied upon by Defendants, *see Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765 (5th Cir. 1978), *modified*, 594 F.2d 163 (5th Cir. 1979), is not binding on this Court.  More importantly, *Finch* is inconsistent with the Supreme Court's decision in *Allen*, and reflects the very circuit split discussed in Plaintiff's opening brief (ECF 27-1, p. 18 n. 8).  As previously noted, the Second Circuit has firmly taken a stance on the opposite side of this split.  *See Finch*, 585 F.2d at 773 (5th Cir. 1978) (explicitly recognizing that its determination was at odds with the Second Circuit's decision in *Aguayo*).

Further, even though not required for oath-of-office standing under *Aguayo*, Mr. Merola has plainly alleged that he faces a realistic threat of removal from office or loss of funding in the event he refuses to implement the Green Light Law.  Indeed, he has submitted supporting proof

consisting of a copy of the State's previous threat to remove him from office and to withdraw funds from the Clerk's Office in the event he failed to issue driver's licenses to illegal aliens as directed by the Commissioner.  As noted in the Merola Declaration (ECF 27-2, ¶¶ 43-46), such threats were explicitly made in 2007 in connection with attempted enforcement of a regulation virtually identical to the provision in the Green Light Law requiring issuance of driver's licenses to illegal aliens.  And despite copious opportunities to do so since the enactment of the Green Light Law (which codifies the same requirement), Defendants have refused to disavow their earlier threats of removal from office and withdrawal of funding[4] for a failure to comply.  *See also Hedges v. Obama* 724 F.3d 170 (2d Cir. 2013) (a plaintiff may presume that the government intends to force the law "in the absence of a disavowal" of such intent).  Notably, these facts were *not* alleged in the *Kearns* case upon which Defendants rely so heavily.  In their motion to dismiss, Defendants have completely ignored the fact that Mr. Merola's allegations that his position and funding for his office are in jeopardy (supported by a copy of the threat itself) are indistinguishable from the board members' allegations in *Allen*, where the Supreme Court found that oath-of-office standing "no doubt" existed.  *Allen*, 392 U.S. at 241 n. 5.

Further, Defendants incorrectly argue that to demonstrate standing, Mr. Merola must prove that by implementing the Green Light Law, he would face a credible threat of federal prosecution for either harboring or inducing illegal aliens or engaging in voter fraud.  *See generally* ECF 30-1, pp. 11-16.  Although a plaintiff seeking to assert claims in his or her individual capacity might be

---

[4] Defendants inexplicably cite *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) for the proposition that claims of lost revenues to the clerk's office is "too speculative to support standing" (ECF 30-1, p. 12).  In fact, *Clapper* did not involve an assertion of oath-of-office standing.  Nor did it involve a threatened removal of funding for failure to comply with a state law.  Rather, *Clapper* involved the plaintiffs' speculation that, under a certain chain of future possibilities, certain of their communications might be unlawfully intercepted through surveillance by the government pursuant to the challenged statute.  *Id.*  The case therefore does not stand for the stated proposition, and has no bearing here.

required to submit such proof (*see e.g.*, *Kearns*), Mr. Merola has not sued in his individual capacity.[5]   And no such requirement exists for a state official seeking to assert oath-of-office standing under *Allen* and *Aguayo*.   Defendants' lengthy arguments on that point, as well as their reliance on *Kearns*, are therefore irrelevant.

Defendants suggest that striking down the Green Light Law would not redress Mr. Merola's injury, incorrectly arguing that preexisting DMV policies already prohibit information sharing with federal immigration authorities.   Preliminarily, this argument makes little sense because if such information sharing was already prohibited, the prohibition in the Green Light Law would be unnecessary and superfluous.   Regardless, the Green Light Law clearly imposes on Mr. Merola obligations not created by existing DMV policies, including obligations to affirmatively prevent his office from cooperating with federal immigration authorities, and to

---

[5] As noted in Mr. Merola's opening brief (ECF 27-1, p. 20, n. 10), however, in the event this Court deems it necessary and appropriate, Mr. Merola would seek the Court's permission to amend his complaint to assert claims in his individual capacity on the basis of the credible threat of prosecution.   "A plaintiff bringing a pre-enforcement facial challenge . . . [need] only [demonstrate] that it has 'an actual and well-founded fear that the law will be enforced against'" it. *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382-83 (2d Cir. 2000) (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988)) (where the plaintiff had a reasonable fear that its activities could be deemed proscribed by statute, even the State's representation that it did not intend to prosecute could not destroy his standing); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) ("[I]t is 'sufficient for standing purposes that the plaintiff intends to engage in a 'course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the provision will be invoked against the plaintiff.'") (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)) (other citations omitted).   Here, under the circumstances, Mr. Merola's fear of prosecution and removal from office and loss of funding for failure to comply with the Green Light Law are based upon explicit threats which have never been disavowed (despite ample opportunity), and are thus well-founded. Further, Mr. Merola has identified threats made by the executive branch against state officials who seek to create sanctuaries for illegal aliens seeking to avoid detection by federal immigration authorities.   *See* ECF 1, ¶ 37 & n. 19, 20.   Defendants' reliance on *Poe v. Ullman*, 367 U.S. 497 (1961) is also misplaced.   *See* ECF 30-1, p. 20.   That case is distinguishable because it involved a challenge to an 82-year-old statute, which had never once been enforced during its entire existence. *See Poe*, 367 U.S. at 502.

participate in notifying applicants and license holders of any requests for their information received from federal immigration authorities. N.Y. VTL § 201(12)(a) (as amended).

Existing DMV policies are also not nearly as broad as Defendants suggest. Those policies only vaguely prohibit disclosure of information for non-business purposes. *See* ECF 30-2 (Scott Aff.), Ex. A. The policies then incorporate by reference the federal Driver's Privacy Protection Act ("DPPA"), and require any DMV agent receiving a request for personal customer information to review the DPPA to determine whether "a permissible use exists" for the information requested. And the DPAA itself lists as a permissible use the disclosure of driver's license records "[f]or use by ***any*** government agency." 18 U.S.C. § 2721(b)(1) (emphasis added). Thus the existing policies do not, as Defendants contend, prohibit sharing information with federal immigration agencies.

    2.   <u>Plaintiff Has Capacity to Challenge the Green Light Law.</u>

This Court should also deny Defendants' motion under Rules 12(b)(6) and 12(c) to dismiss the Complaint for lack of capacity. As noted in Mr. Merola's original motion papers (*see* ECF 27-1, pp. 21-22), Mr. Merola has capacity to challenge the Green Light Law because it requires him to violate a constitutional proscription. *See City of New York v. State of New York*, 655 N.E.2d 649 (N.Y. 1995). Namely, it requires him to violate the Supremacy Clause. It also requires him, as the State agent offering voter registration, to violate the State Constitution proscription on voting by non-citizens. Thus Defendants' argument that Mr. Merola has "failed to identify any specific constitutional provision" (*see* ECF 30-1, p. 11) is incorrect.

Defendants have, not surprisingly, failed to provide a single citation for their unsupportable argument that the Supremacy Clause is not a "constitutional proscription" applying to Mr. Merola. *See* ECF 30-1, p. 11. The Supremacy Clause is plainly a constitutional proscription against the enforcement and/or implementation of preempted state laws. And Mr. Merola, in his capacity as a

State official, is indeed subject to that constitutional proscription.  It is precisely because state officials may not violate the Supremacy Clause that they are frequently subject to orders enjoining them from implementing or enforcing federally preempted state laws.  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 219 (2d Cir. 2008); *Valle del Sol Inc.*, 732 F.3d at 1029; *Ga. Latino Alliance for Human Rights v. Gov. of Georgia*, 691 F.3d 1250 (11th Cir. 2012).  Such case law refutes the absurd notion that Mr. Merola is not bound to comply with the Supremacy Clause, and on that basis lacks capacity to sue.

**B.      PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION.**

       1.      <u>Plaintiff Can Challenge the Green Light Law on Preemption Grounds.</u>

The Green Light Law forces Mr. Merola to decide whether to violate the State law or to participate in a State scheme which runs afoul of multiple federal statutes.  The State audaciously suggests that Mr. Merola is not permitted to seek judicial relief to extricate himself from this predicament (*see* ECF 30-1, pp. 20-21), relying on *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382 (2015).  That case, however, is inapplicable and does not bar this lawsuit.

In *Armstrong*, habilitation service providers sued Idaho officials, claiming Medicaid reimbursement rates provided were lower than required under the federal Medicaid Act.  The Court held that the habilitation service providers could not bring suit to enforce the pricing provisions of the federal Medicaid Act because Congress had expressed under that statute an "intent to foreclose equitable relief." *Id.* at 1385.  For example, in *Armstrong*, the plaintiffs could obtain the sought-after equitable relief through administrative remedies made available to them. *Id.* at 1387.  No such remedies are available to Mr. Merola, and the federal immigration statutes at issue here do not otherwise suggest any intent by Congress to foreclose equitable relief.  The

10

*Armstrong* decision did not, as Defendants argue, create a categorical bar on anyone other than the federal government suing on the basis of preemption.

Notably, unlike the plaintiffs in *Armstrong*, Mr. Merola is not seeking to "enforce" any federal statute. *See* ECF 30-1, p. 20. Therefore, that certain of the federal statutes cited as conflicting with the Green Light Law do provide for a private right of action is irrelevant. Defendants do not contend that the various statutes that preempt the Green Light Law (*see* Sections B.3 & B.4, *infra*) preclude the Court from granting the equitable relief sought by Mr. Merola, nor could they. The Second Circuit and district courts in this Circuit have routinely recognized the limited scope of the ruling in *Armstrong*. *See, e.g.*, *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 145 (2d Cir. 2016) (contrasting the Medicaid Act and the Airport Noise and Capacity Act and concluding that a suit claiming local aviation laws were preempted was proper); *New York State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 85 (2d Cir. 2019) (construing *Armstrong* as permitting a Section 1983 suit claiming that state law was preempted); *UnitedHealthcare of New York, Inc. v. Vullo*, 323 F. Supp. 3d 470, 479 (S.D.N.Y. 2018) (concluding that the ACA "cannot be analogized to the Medicaid statute in either of the two ways prompting jurisdictional concern in *Armstrong*").

    2.   <u>Enacting the Green Light Law Exceeded the State's Police Powers.</u>

Defendants' attempt to characterize the Green Light Law as one that "regulates in an area of traditional state concern" (ECF 30-1, p. 22) misstates both the purpose and effect of the law. Although states may enact laws governing the issuance of driver's licenses, they may not, under the guise of regulating driving licensure, interfere with comprehensive federal laws pertaining to immigrants and immigration. In fact, it is well established that "an assumption of non-preemption

11

is *not* triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (emphasis added).

The Green Light Law does not simply govern the issuance of driver's licenses; it effectuates a State-sponsored scheme to induce illegal aliens to live and work in New York and move freely throughout the nation, shield illegal aliens from detection from federal immigration agencies, obstruct efforts by federal authorities to investigate illegal aliens, and provide illegal aliens access to the ballot box. These are not valid State prerogatives. The Green Light Law stretches far outside of the State's traditional police powers, invading Congress's comprehensive and cohesive regulation of illegal aliens. *See Whiting*, 732 F.3d at 1024 (holding that Congress has enacted a comprehensive federal scheme "governing the movement of unauthorized aliens in the United States"); *United States v. South Carolina*, 720 F.3d 518, 531-32 (4th Cir. 2013) ("The federal government has clearly occupied the field of regulating the concealing, harboring, and transporting of unlawfully present aliens"). The Green Light Law is therefore not entitled to a presumption against preemption.

The majority of the above-listed objectives of the law were expressly stated by the Act's sponsors and supporters. For example, the Bill Memorandum expressly states that the Act's purposes included to: "address[] the long-held need by undocumented immigrants and workers to secure driving privileges not only to get back and forth to work but conduct tasks in their personal lives like taking their children to school" and to "protect[] the data of those applying for such privilege from unwarranted release." *See* ECF No. 27-3, Ex. A, at p. 2. Sponsor Senator Luis Sepulveda stated that the privacy protections in the law "provides a certain level of protection . . . for undocumented immigrants so that they feel a sense of comfort in obtaining these licenses" and "to prevent any federal agency that their primary purpose is enforcement of immigration laws."

12

N.Y. Senate Debates on Bill A3675B, at 5930.  The admitted purposes of the Green Light Law make clear that the law exceeds the bounds of permissible state legislation.

Moreover, unlike traditional police powers, which may be employed only to regulate conduct within its borders, New York's Green Light Law has significant nationwide consequences. Some examples include:

- For the next 10 months, until October 1, 2020, when the REAL-ID Act of 2005 goes into effect, illegal aliens would be able to use non-compliant New York licenses to board a plane for a domestic flight.[6]

- The driver's license available under the Green Light Law to illegal aliens allows those individuals to drive a truck carrying up to 26,000 pounds.  *See* N.Y. VTL § 501(2)(a)(iv). The Green Light Law thus allows illegal aliens to transport such enormous loads nationwide.

- The Green Light Law provides voter registration opportunities to illegal aliens at the same time those persons apply for a driver's license.  Defendants admit that, once an applicant registers to vote, the local board of election has no way to determine whether or not the registered voter is a citizen.  *See* ECF 30-5 (MacDonald Aff.), at ¶ 16.  Once registered, illegal aliens could freely vote in federal elections, diluting the votes of qualified voters.

Because of the many and varied ways state and federal governments rely on and use driver's licenses as proof of identification, the Green Light Law not only endangers and disenfranchises New Yorkers, but creates unwarranted risks for residents of other states as well.

3.    The Green Light Law Is Preempted Based on Field Preemption Principles.

As noted, Defendants seek to narrowly define the field occupied by the Green Light Law as merely "governing issuance of standard driver's license."  ECF 30-1, p. 27.  They devote just three sentences (*see* ECF 27-1, p. 27) to addressing (unsuccessfully) Mr. Merola's detailed arguments that Congress's comprehensive federal scheme governing the movement of unauthorized aliens preempts the Green Light Law (*see* ECF 21-1, pp. 5-10).

---

[6] Department of Homeland Security, Statement By Secretary Jeh C. Johnson On The Final Phase Of REAL ID Act Implementation (January 8, 2016), at https://www.dhs.gov/news/2016/01/08/statement-secretary-jeh-c-johnson-final-phase-real-id-act-implementation.

Numerous courts have held that Sections 1324(a)(1)(A)(iii) and (iv), which criminalize the "conceal[ing], harbor[ing], or shield[ing]" of illegal aliens and "encourage[ing] or induc[ing] an alien to come to, enter, or reside in the United States," occupy a broad field "governing the movement of unauthorized aliens in the United States." *See, e.g.*, *Valle del Sol*, 732 F.3d at 1025-26; *Lozano v. City of Hazleton*, 724 F.3d 297, 316-18 (3d Cir. 2013), *South Carolina*, 720 F.3d at 531-32 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012); *Ga. Latino Alliance for Human Rights*, 691 F.3d at 1267 (11th Cir. 2012). Defendants' argument that the Green Light Law does not occupy this same field is incorrect because the Green Light Law (i) prohibits disclosing records or information to federal immigration authorities, (ii) requires the notification of individuals whose information is requested by such federal authorities, and (iii) authorizes the issuance of a type of driver's license that intentionally cloaks the immigration status of the recipient from federal authorities. *See* N.Y. VTL § 201(12)(a) (as amended). It thus mandates the same type of conduct that has been found to violate these federal statutes. *See United States v. George*, 779 F.3d 113, 118 (2d Cir. 2015) (harboring); *United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999) (same); *United States v. Ye*, 588 F.3d 411, 415 (7th Cir. 2009) (same); *United States v. Ndiaye*, 434 F.3d 1270, 1298 (11th Cir. 2006) (inducing); *United States v. Oloyede*, 982 F.2d 133, 136 (4th Cir. 1992) (same).

For these same reasons, the Green Light Law invades even the more narrowly-defined field of "harboring and inducing persons to remain in the U.S." that Defendants' argue should be adopted by the Court. Even complimentary laws in this exclusive federal field are preempted, *see Arizona v. United States*, 567 U.S. 387, 401 (2012), and thus the Green Light Law (which seeks to

actively disrupt the enforcement of these federal immigration laws broadly governing the movement of illegal aliens) is likewise unconstitutional.[7]

    4.    <u>The Green Light Law Is Preempted Based on Conflict Preemption Principles.</u>

In addition to unconstitutionally regulating in the same field as Congress, the Green Light Law unconstitutionally conflicts with multiple federal laws. Defendants failed to rebut Mr. Merola's showing that that is "physically impossible" for him to simultaneously comply with both the Green Light Law and: (1) 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (iv), which criminalize the harboring and inducing illegal aliens; (2) 8 U.S.C. §§ 1644 and 1373(a), which prohibit any restriction on information sharing with federal immigration laws; (3) federal voting laws; and (4) the REAL-ID Act. Defendants have also failed to rebut Mr. Merola's showing that the Green Light Law obstructs federal enforcement of Sections 1324(a)(1)(A)(iii) and (iv) and 8 U.S.C. § 1324a (the federal law governing the employment of illegal aliens).

    i.    *8 U.S.C. §§ 1324(a)(1)(A)(iii) and (iv) – Criminal Harboring and Inducing*

Mr. Merola has demonstrated that the Green Light Law conflicts with subdivisions (iii) and (iv) of the federal anti-harboring statute (8 U.S.C. §§ 1324(a)(1)(A)), which prohibits harboring illegal aliens against detection and inducing illegal aliens to reside in the United States.

The predicate for Defendants' argument that there is no conflict with these federal criminal statutes is that "under the scheme established by the Act, there will be no opportunity for Merola to know whether any particular applicant is unlawfully present or if their continued presence would violate immigration law" (ECF 30-1, p. 30). First, this Court should reject this argument as pure conjecture. Second, this argument is refuted by Mr. Merola's sworn declaration, in which he

---

[7] Mr. Merola does not contend that federal immigration laws concerning employment of illegal aliens are field preemptive and, therefore, the two pages Defendants devote to this argument are irrelevant and can be disregarded by the Court. *See* ECF 30-1, pp. 27-28.

explains that he personally works the Rensselaer County DMV window daily and that residents often voluntarily share information concerning their current legal statuses. *See* ECF 27-2 at ¶¶ 10-11. Because the Green Light Law invites more aliens into the DMV, instances of such unsolicited statements would likely increase, as opposed to disappear.

This Court should also reject Defendants' strange argument that the Green Light Law is not preempted because declining to report information to federal immigration authorities concerning illegal aliens does not violate Section 1324(a)(1)(A)(iii)'s anti-harboring provision. First, this is not a case of Mr. Merola simply declining to report information; rather, the Green Light Law *prohibits* him from sharing information and mandates that he *actively prevent* and *restrict* his office from responding to inquiries by federal immigration authorities. Second, the only decision cited by Defendants in support of this argument—*DelRio-Mocci v. Connolly Properties Inc.*, 672 F.3d 241, 246 (3d Cir. 2012)—explicitly states that the Third Circuit has adopted a more narrow interpretation of "harboring" than other circuits. Defendants do not dispute that the conduct the Green Light Law requires Mr. Merola to undertake falls within the broad definition of "harboring" utilized by the Second Circuit, nor have they attempted to distinguish the Second Circuit decisions cited by Mr. Merola. *See George*, 779 F.3d at 118 (harboring includes conduct intended "(1) substantially to facilitate an illegal alien's remaining in the United States, and (2) to prevent the alien's detection by immigration authorities"); *Kim*, 193 F.3d at 574 (2d Cir. 1999) (harboring is "conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence").

Defendants also do not address Mr. Merola's contention that the law conflicts with the federal prohibition against "encouraging or inducing an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence

is or will be in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iv).  As noted above, in many cases Mr. Merola has actual knowledge that certain applicants are illegal aliens.  Regardless, however, actual knowledge is not required to violate this federal statute.  And for Mr. Merola to participate in the State's scheme knowing that it will incentivize illegal aliens to continue to reside in the United States would at the very least qualify as reckless disregard.   And it is worth noting here that Defendants' argument that Mr. Merola does not face a credible threat of prosecution under these statutes, while incorrect, is not the same or a substitute for an analysis of whether the Green Light Law unconstitutionally conflicts with these federal statutes.

Defendants' contention that Green Light Law's notification requirement is not preempted by these provisions likewise fails.  Defendants speculate that it is "highly unlikely that the notification requirement will implicate Mr. Merola."  *See* ECF 30-1, p. 30.  But this is incorrect. As set forth in Mr. Merola's declaration, the notification requirement would require him to take immediate action to train his staff, and ensure that his office is prepared to act promptly to notify either the individual or Commissioner of any requests received.  In so doing, Mr. Merola would be at the very least aiding and abetting an effort to violate the federal anti-harboring law.

Additionally, on its face, the statute applies not only to subpoenas, judicial warrants, and court orders (which Defendants contend can only be received by DMV), but also to any "requests" by federal immigration agencies.  *See* N.Y. VTL § 201(12)(a) (as amended).  It is entirely plausible that the Rensselaer County Clerk's Office will receive such requests, particularly given that federal agencies have previously sought to obtain such records from the licensing authorities in other states that issue driver's licenses to illegal aliens.[8]  Indeed, the Green Light Law increases

---

[8] *See* ICE Used Facial Recognition to Mine State Driver's License Databases, NEW YORK TIMES (July 7, 2019); at https://www.nytimes.com/2019/07/07/us/politics/ice-drivers-licenses-facial-recognition.html

the likelihood of such requests, given that federal immigration authorities will know that the Clerk's Office may have a photograph and/or address for illegal aliens under investigation. Even the sparse case law Defendants cite establishes that warning illegal immigrants that they are being investigated by federal immigration authorities does in fact constitute illegal harboring. *See United States v. Herrera*, 584 F.2d 1137, 1145 (2d Cir. 1978).

  ii.  *8 U.S.C. §§ 1644 and 1373(a) – Prohibition on Information-Sharing Restrictions*

  Defendants unsuccessfully attempt to explain away the obvious conflict between the Green Light Law and federal information-sharing statutes. Federal law dictates that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). New York's Green Light Law prohibits DMV officials, the DMV Commissioner's agents, and their employees from providing information or records obtained from standard license applicants to federal immigration agencies. N.Y. VTL 201(12)(a) (as amended). The Green Light Law would thus require Mr. Merola to prohibit and otherwise restrict his staff from sharing such information from federal authorities. The direct conflict is facially apparent.

  Defendants' assurance that there "will be [no] opportunity for DMV officials to learn information [covered by Sections 1644 and 1373(a)] in performing their duties," is plainly incorrect. First, the County Clerk's Office absolutely has access to "information regarding" the legal statuses of those having driver's licenses. Indeed, whether a person has been issued a REAL-ID compliant or noncompliant driver's license, and whether a person's visa is reflected as having expired, certainly relates to that person's legal status, even if does not conclusively prove whether the person is in the country illegally. Regardless, the notion that the County Clerk's Office would

have *no opportunity* under the Green Light Law to learn definitively that a person is in the country illegally is speculative, and inconsistent with Mr. Merola's sworn testimony based upon his many years of experience as a county clerk and having received such information. *See* Merola Decl. ¶¶ 10-11. The Green Light Law would, in violation of federal law, require Mr. Merola to prevent his office from sharing any such information with federal immigration authorities.

Contrary to Defendants' contention, the federal information-sharing statutes are constitutional. Indeed, the Second Circuit has already upheld the constitutionality of these statutes on a Tenth Amendment challenge. *See City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). The two district court decisions cited by Defendants are not binding, and were incorrectly decided, and one of those decisions is currently on appeal to the Second Circuit.[9] The district courts in those cases misread and misapply the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). In *Murphy*, the Supreme Court held that a federal law which did nothing other than prohibit states from authorizing sports gambling violated anti-commandeering. *Id.* Because the challenged federal law was a standalone restriction on the states, and not part of any broader federal legislation legitimately governing private actors, it was not a valid preemption provision. *Id.* at 1480. To the contrary, here, the federal information-sharing statutes *are* part of comprehensive federal immigration legislation that validly regulates private actors.[10] Therefore, the statutes in question validly preempt conflicting state law.

---

[9]   *See State of New York et al. v. Barr*, Case No 19-267 (2d Cir.).
[10]   The statutes also grant individuals a federal right to cooperate with federal immigration authorities if they choose to do so.

iii.        *Voting Laws*

Defendants incorrectly assert that the Green Light Law "does not conflict with any voter registration laws," and not surprisingly cite no supporting legal authority.  *See* ECF 30-1, p. 33.  In making their argument, Defendants completely discount the county clerk's central role in the voter registration process, suggest that county clerks should simply have blind faith that illegal aliens will decline the opportunity to register to vote, and ignore that the Green Light Law dramatically increases the volume of ineligible voters whom county clerks may be forced to add to the voter rolls.  In reality, it would be impossible for any county clerk to comply with the Green Light Law's requirement of issuing driver's licenses to illegal aliens without simultaneously running afoul of federal laws that prohibit and criminalize voter fraud and vote dilution, *see e.g.*, 18 U.S.C. §§ 241, 242; 52 U.S.C. § 10307(c), and of the State Constitution which limits voter registration to qualified citizens, *see* New York State Constitution, Art. II, § 1.

First, Defendants' attempt to characterize Mr. Merola as having no role in the voter registration process falls flat.  As County Clerk, Mr. Merola serves as the DMV Commissioner's agent in providing voter registration opportunities to every driver's license applicant in Rensselaer County as required by the National Voter Registration Act of 1993.  *See* N.Y. VTL § 205(1)-(2). As such, he is therefore the *primary* government official charged with ensuring that his Office, as required under federal law, offers driver's license applicants voter registration.

Second, and stunningly, Defendants *admit* that local boards of election have no ability to verify the citizenship of those who have registered to vote.  *See* ECF 30-5 (MacDonald Aff.), at ¶¶ 16-17.  Defendants also admit that New York's voter registration system is structured so as to rely exclusively on the honor system — blind acceptance of self-reporting by registrants.  The assumption that applicants can be relied upon to earnestly and accurately report their legal statuses

is at best naïve.  At worst, New York's purposeful adoption of a flawed system reflects its desire to open up the voter rolls to illegal immigrants and its blatant disregard for the rights of its own citizens and proscriptions of federal law.  Notably, in California, another state that issues driver's licenses to illegal aliens, a recent audit revealed that over 1,500 people were incorrectly registered to vote, including many non-citizens.[11]  New York passed the Green Light Law, knowing that its voter registration system will inevitably allow illegal aliens to be added to the voter rolls. Defendants frankly admit this.  *See* ECF 30-1, p. 19 ("That ineligible voters may — inadvertently or otherwise — register to vote has long been a possibility . . .").  And New York's Green Light Law now, for the first time, conscripts Mr. Merola to participate in this scheme to grant such opportunities to illegal aliens under color of state law, and in direct violation of federal law.

Third, the Green Light Law, by inviting illegal aliens to apply for driver's licenses, would create the perfect storm.  Illegal aliens, who would now have a reason to seek a driver's license and whose legal status would be cloaked in secrecy, inevitably would register to vote when provided the opportunity to do so.  But the Defendants contend that Mr. Merola not only cannot do anything about it, but must affirmatively offer voter registration opportunities to illegal aliens. This is precisely the conflict.  Before the Green Light Law, those applicants had little to no reason to be in the driver's license application queue and would not have been presented with an opportunity to register to vote.  Now, even if an applicant openly declares that he or she is an illegal alien and intends to register to vote, Mr. Merola and his staff must affirmatively grant that illegal alien the opportunity to proceed with registering to vote.  Such conduct would violate federal law and the State constitution.

---

[11] Layered on top of previous mistakes, California's DMV finds an additional 1,500 people wrongly registered to vote under new system, LOS ANGELES TIMES (Oct. 8, 2018), at https://www.latimes.com/politics/la-pol-ca-dmv-more-voter-registration-errors-20181008-story.html

iv.       *REAL-ID Act*

Defendants did not address Mr. Merola's argument that the REAL-ID Act conflicts with the Green Light Law.  This concern is real and cannot be ignored.  Congress passed the REAL-ID Act after the release of the 9/11 Commission Report, which concluded that "[a]ll but one of the 9/11 hijackers acquired some form of U.S. identification document . . . . [which] would have assisted them in boarding commercial flights, renting cars, and other necessary activities."  *See* Compl., at ¶ 58, citing 9/11 Commission Report, at 390.  Notwithstanding that recent traumatic history, Defendants brush off the significant risks of issuing licenses to illegal aliens, denigrating Mr. Merola's national security concerns as "misplaced" and suggesting that the risk that terrorists will utilize New York-issued identifications are only "purported harms" (ECF 30-1, p. 17). Critically, the Green Light Law would permit illegal aliens who have never been vetted by Homeland Security to board commercial flights until October 1, 2020.[12]

And practically speaking, the Green Light Law facilitates illegal aliens in boarding commercial flights even after the REAL-ID Act is fully implemented because the non-compliant driver's licenses required to be issued to illegal aliens under the Green Light Law do not use a unique design or color indicator to distinguish them from REAL-ID Act compliant licenses, as they must.  *See* Pub. L. 109–13 § 11.  Contrary to Defendants' suggestion, this Court need not defer to any administrative agency when determining whether the licenses to be granted under the Green Light Law to illegal aliens comply with the express terms of the federal statute, particularly

---

[12] *See* Department of Homeland Security, Statement By Secretary Jeh C. Johnson On The Final Phase Of REAL ID Act Implementation (January 8, 2016), at https://www.dhs.gov/news/2016/01/08/ statement-secretary-jeh-c-johnson-final-phase-real-id-act-implementation.

when it is clear they do not.[13]  A New York license granted to an illegal alien would be virtually indistinguishable from a REAL-ID compliant license, and federal authorities, charged with knowing the specifics of licenses (compliant and non-compliant from all 50 states), would inevitably overlook the minor difference between them.  It is improper to require county clerks to participate in a scheme that endangers Americans.  This concern is paramount.

> v.       *8 U.S.C. § 1324a – Employment of Illegal Aliens*

The Green Light Law also stands as an obstacle to Congress's objectives in regulating the employment of illegal aliens as set forth in 8 U.S.C. § 1324a.  The express purpose of the Immigration and Reform Act of 1986 was to enact a comprehensive framework to "combat[] the employment of illegal aliens."  *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).  But the intended effect of the Green Light Law is to make it easier for illegal aliens to find and maintain employment. *See* Compl. ¶ 49; Sleight Decl., Ex. A, at 2.  Where, as here, a state law's purpose or effect frustrates implementation of a federal objective, it is preempted.  *See Felder v. Casey*, 487 U.S. 131, 138 (1988).

Defendants point to the statute's express preemption provision, but that section does not foreclose the application of normal conflict preemption principles.  *See Arizona*, 567 U.S. at 406 ("[T]he existence of an express preemption provision does not bar the ordinary working of conflict preemption principles or impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause.") (internal quotation marks and alterations omitted). In fact, even in the absence of an express preemption provision, the Supreme Court struck down a state law that punished illegal aliens for obtaining employment on the basis that it disrupted the

---

[13] There is no indication that the Department of Homeland Security has performed any evaluation of New York's licenses after that the Green Light Law was enacted, and with knowledge that such licenses will definitively be used by illegal aliens.

comprehensive regulatory scheme.  *See id.* at 406-407.  By logical extension, state laws that assist illegal aliens in finding and maintaining employment are likewise preempted.

    5.    <u>Plaintiff Demonstrated Irreparable Harm and that the Equities Favor Granting an Injunction.</u>

Incredibly (given the national security interests at stake), Defendants dedicate less than a page to addressing irreparable harm and a tipping of the equities.  And all but two sentences of Defendants' argument is dedicated to reciting general propositions of law having no bearing on this case.  *See* ECF 30-1, p. 34.  Defendants do not even attempt to refute Mr. Merola's showing that the Green Light Law will facilitate terrorists and others who wish to do harm avoid detection by federal law enforcement.  In fact, they ignore the lessons the United States learned from the 9/11 attacks — namely, that such heinous acts were facilitated because illegal aliens were able to secure access to forms of identification that allowed them to blend in with the United States citizenry, and were thus able to move freely throughout the country.  As set forth above, it is indisputable that illegal aliens acquiring driver's licenses under the Green Light Law will be able to use Green Light licenses to board commercial flights for a full ten months after implementation (before the October 2020 implementation date for the REAL-ID Act), and likely also thereafter given that they are virtually indistinguishable from licenses issued for federal purposes.  According to Defendants, however, these harms are only "purported" and "illusory."

Defendants also ignore the irreparable harm that will occur to qualified voters, whose votes will inevitably be diluted in violation of their constitutional rights.  Defendants fully admit in the McDonald Affidavit that the Green Light Law will allow for such dilution to occur.  This deprivation of constitutional rights is particularly pressing in the near-term (for purposes of a preliminary injunction), given the upcoming 2020 state elections.

Nor do Defendants even attempt to respond to Mr. Merola's showing that the Clerk's Office itself will suffer irreparable harm in the form of lost public trust, good will, and reputation if Mr. Merola is conscripted into a State-sponsored scheme to undermine national security interests, promote illegal immigration, thwart federal immigration authorities, and dilute the votes of the citizens of Rensselaer County.

Instead, Defendants are relegated to arguing that the State should be entitled to collect increased tax and licensing revenues associated with implementing the Green Light Law, and asserting in conclusory fashion (with no supporting proof) that the Green Light Law will somehow improve road safety. Respectfully, Defendants have come nowhere near to rebutting Mr. Merola's showing of irreparable harm and that the equities tip in favor of preliminary injunctive relief.

## <u>CONCLUSION</u>

Based upon all of the foregoing, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss, issue an order granting Plaintiff's motion for a preliminary injunction, and grant such further relief in favor of Plaintiff as the Court deems just and proper.

Dated:   December 2, 2019
      Albany, New York

           HARRIS BEACH PLLC

           By: */s/ Karl J. Sleight*          
               Karl J. Sleight, Esq. (Bar Roll No. 601976)
               Elliot A. Hallak, Esq. (Bar Roll No. 520048)
               Kelly S. Foss, Esq. (Bar Roll No. 519047)
               677 Broadway, Suite 1101
               Albany, New York 12207
               Tel: (518) 427-9700
               Fax:  (518) 427-0235
               ksleight@harrisbeach.com
               ehallak@harrisbeach.com
               kfoss@harrisbeach.com
               *Attorneys for Plaintiff*